People of the State of Illinois, Plaintiff-Appellee, v. James Lees and Peter Loonam, Defendants-Appellants.

Gen. No. 49,902.

First District, Second Division.

June 8, 1965.

Rehearing denied June 28, 1965.

Prentice H. Marshall, of Chicago, for appellants.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Chief of Criminal Appeals, and Ronald Butler, Assistant State's Attorney, of counsel), for appellee.

MR. JUSTICE BRYANT delivered the opinion of the court.

This appeal comes from a judgment entered April 20, 1964, in the Circuit Court of Cook County, Criminal Division, finding the appellants, James Lees and Peter Loonam guilty of the crime of aggravated battery.

The appellants were employed as part time policemen by the Village of Dixmoor. The complaining witness, John Dauber, was driving his automobile on

Western Avenue in Dixmoor at or about 6:00 a. m., Sunday morning, December 14, 1962, when he was stopped by the appellant officers for speeding. When stopped, Dauber left his car and walked over to the police car. He admits that he had been drinking that evening and that he tried to bribe the appellants so that they would not give him a ticket. It is undisputed that they did not accept his offer and that when they detected alcohol on his breath they told him he would have to go to the station with them. There is no question but that the arrest was a proper one, as the complaining witness stated at the trial that he was driving his automobile after having consumed several alcoholic drinks, and nothing was presented at the trial to refute the claim of the officers that Dauber was in fact driving under the influence of alcohol.

The only other person who witnessed what occurred on Western Avenue that morning was Madelyn Fox. She had met the complaining witness earlier that morning at a tavern and later had gone with him for coffee and something to eat. Dauber stated that he had known Miss Fox for four or five years.

What occurred on Western Avenue is a matter of great dispute but we shall try to set forth the salient portions of the testimony of each of these persons.

The complaining witness, John Dauber, testified that after he was stopped by the police he got out of his car and went over to the police car where the officers were sitting. He stated that the officers told him he was speeding and that he asked them if there was anything they "could do to settle it." The officers declined his offer and asked for his driver's license.

The complaining witness testified: ". . . I gave it to him and he said, 'Your name is Dauber, huh?' and I said, 'Yes, it is,' and I looked down in the squad car and I recognized that those were the two policemen that I had asked to help me one night when a friend

of mine got hit in the head and I said, 'Forget any favors,' I said, 'I don't want any.' I said, 'Just give me the ticket and be done with it.' "

Dauber then testified that Officer Loonam called him a vile name and that Loonam then got out of the car and grabbed him and pushed him up against the fender. The complaining witness stated that at that time, "there were words back and forth."

Dauber's testimony continued, ". . . I said, 'If you hit me you will be sorry,' so he started to pull out his revolver and that is when I tried to push him away and he called the other policeman and the other one come running around the side of the squad car and he had his club in his hand and when he struck me in the head . . ."

The testimony of the police officers differ in many respects from that of the complaining witness. Officer Loonam testified that Lees was driving the police car that night and that he was sitting in the front seat with him. He stated that Officer Lees got out of the car and went to Dauber's automobile and took the driver's license from the complaining witness. Lees brought the license back to Loonam who then began making out the ticket. Loonam testified that Dauber then came over to the police car and said, "Is this the only way we can handle it?" The witness said he responded, "Sir, I have no idea what you are talking about." Dauber is reported to have replied, "Let's forget this right now and carry this no further."

"Then he backed out for a minute and he stuck his head back in again and he said, 'You are the two,' and I said, 'We are the two what?' he said, 'You are the two that wouldn't help me last January when I was in the fight at the Red Fence.' He says, 'You know me, look at me.' Well, when he mentioned the Red Fence and the fight I recalled the incident then and I told him that I knew his brother Billy but the only

257

time I had ever met this fellow before was the previous January when he had that fight.

"Then he started to get real indignant, he stuck his head and half his shoulders in the car window and he was practically nose to nose and I could smell alcohol on his breath and he started to scream again, he said, 'You are the two, you are the two,' and at that time I informed him that he was under the influence of liquor and he would have to accompany us to the station where he could take a breatholizer test if he wishes or refused, which was his right. . . .

"Well he backed out of the car and he stood straight up and his face was real red and he was sort of shaking. He says, 'I will go to your — station with you.' I said 'What?' He said, 'I will kick the — out of you too.' With that he opened the squad car door at which time I stepped out and I shut the door and he was standing right alongside the front fender and I said, 'Listen, this doesn't call for this, it's not a bank robbery, it's only a traffic violation.' Then at that time he took a swing at me, he hit me in the neck and I moved in on him and I grabbed him. I grabbed him around the wrist and I pinned his body to the squad car and I yelled for Jim to get out of the car and put the handcuffs on this man.

"Well, before Jim could get there he had managed to get me off of him and he pushed me back and he turned around towards Jim. At that time I grabbed him from behind again but only this time I had one arm around his waist and I had the other arm around the upper part of the body, possibly his neck, I can't recall, and I yelled for Jim to get the handcuffs on him. At this time he was really wild, his feet were off the ground, he was kicking. . .

"He was kicking and screaming and I was just holding him and Jim came around and he kept waving his hands, it was hard to grab him. Usually we try to

handcuff them behind but in this case we couldn't. So he grabbed his left hand and he grabbed his right hand and he got the one cuff on the right hand and he was trying to hold the cuffs and bring the other hand in when he broke loose with the right hand and he was swinging the cuffs around over the head and then he hit me in the neck, he broke my watch crystal, he put two dents in the squad car hood which is right alongside from swinging it.

"Finally, Jim managed to catch his other hand and we handcuffed him in front and then it seemed like all the air went out of him, he stood there for a minute and sat down in the middle of Western Avenue. . . ."

The witness, Loonam stated on cross-examination that neither he nor his partner carried a billy club. He said, however, that he believed there was one in the car.

Loonam further testified that the complaining witness tried to grab his gun during the scuffle and that the gun went off. The officer stated that he did not know who fired the gun since both he and Dauber were grabbing at the gun at the same time.

The testimony of Officer Lees is in substantial accord with that given by Officer Loonam. He testified that when the complaining witness came over to their car he could smell alcohol on his breath. He further said that he did not have a club in his hand when he left the car to put handcuffs on Dauber.

The only other witness present at the scene was Madelyn Fox. She testified that when Dauber left his car to go over to the police car, ". . . I didn't pay any attention at first and then I heard yelling and I got out of the car and I stood on the driver's side and the one officer had Jack up against the car. . . . The other officer got out of the car and he had a club in his hand and he walked around to the side where Jack and the other officer was and then I got back into the

259

car. . . ." She stated she saw Lees with his hand "up in the air with the club in it and he ran around the front of the car, the police car, and he was over there and the club was still in the air and that is when I got into the car, I got back into the car." She said she did not look to see whether a blow was struck.

The incident at the Red Fence, mentioned in this testimony, occurred some months before this arrest. The complaining witness was involved in a fight at that tavern and had sought to file a complaint against one of the men with whom he had been fighting. Dauber also mentioned two other occasions when he had been involved in tavern fights.

While this scuffle by the police car was but the first of several fights between the complaining witness and these two policemen that morning, we feel it is necessary to consider this first incident in some detail since a determination of who was the original aggressor would affect the characterization of all the events that followed.

The Court below found that the policemen were the original aggressors. With that finding we disagree and hold that the finding rests on "doubtful, improbable or unsatisfactory evidence, or clearly insufficient evidence." People v. Clemons, 26 Ill2d 481, 187 NE2d 260 (1963). The evidence was uncontradicted that both appellants had been policemen with good records in the Village of Dixmoor for several years. We believe that it is extremely doubtful that the police would begin to beat a man on the slight provocation of his attempting to bribe them and later telling them not to do him any favors. The Court below pointed out that both policemen weighed over 200 pounds and that the complaining witness was much lighter than they. His decision seems to rest in part on the probabilities of one man attacking two men each of whom was bigger than he. That is a factor to be considered, but it is

hardly conclusive, since there was evidence that Dauber was quite aggressive that morning. The complaining witness admitted that he had been drinking that night and that he had been involved in several "bar room brawls" in the past few years. It was Dauber, the complaining witness, who was shown to be a habitual fighter, not the police officers.

"This resume of the testimony shows that the evidence relating to the material facts in issue was conflicting and cannot be reconciled. Under such circumstances it is the duty of a jury, or of a court sitting without a jury, to determine the credibility of the witnesses and the weight to be given their testimony, and on review, this court will not substitute its judgment for that of the jury or trial court. (People v. Tensley, 3 Ill2d 615; People v. Kirilenko, 1 Ill2d 90.) But it is always the duty of this court to examine the evidence in a criminal case, and if it is so improbable or unsatisfactory as to raise a serious doubt of defendant's guilt the conviction will be reversed. (People v. Williams, 414 Ill 414; People v. O'Connor, 412 Ill 304; People v. Buchholz, 363 Ill 270; People v. Fontana, 356 Ill 461.) A judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of the guilt of the defendant, and it is the insufficiency of the People's evidence which creates such doubt. If a conviction is to be sustained, it must rest on the strength of the People's case and not on the weakness of the defendant's case. (People v. Widmayer, 402 Ill 143; People v. Cullotta, 376 Ill 333; People v. Washington, 327 Ill 152.) The foregoing principle of law is a corollary of the presumption of innocence to which a defendant in a criminal case is entitled, and to the rule that the People have the burden of establishing the defendant's

guilt beyond a reasonable doubt." People v. Coulson, 13 Ill2d 290, 295, 296, 149 NE2d 96, 98 (1958).

█ █ In the case at bar we feel there is a reasonable doubt of the guilt of the defendant police officers. We feel that their account of the affair is more credible than that given by the complaining Dauber. There is nothing in the record which would lead us to believe that these officers would attack a man unless it were necessary in the discharge of their duties. Dauber, on the other hand, has a history of fights. As we must assume the officers innocent until *proven* guilty, we hold that the People's evidence is insufficient to establish the officers as the original aggressors.

We now return to the record in the case before us to determine whether there was evidence showing that the appellant officers used unnecessary force to effect the arrest.

The complaining witness testified that after he was originally subdued by the policemen he got up off the ground and ran over to his car to where Madelyn Fox was sitting and told her, "Remember what you have seen here." This was substantiated by Miss Fox and by the police officers. Officer Loonam stated that when the complaining witness ran over to his car he was screaming for his mother. Officer Lees testified that Dauber told Miss Fox to call his mother and tell her what happened.

We see nothing in Dauber's complaint to Miss Fox that would cause us to change our opinion of the People's proof on the question of who was the first aggressor. It is perfectly possible that Dauber having lost his battle with the police sought to characterize them as the aggressors rather than admit he started a fight which he ended up losing.

The testimony is clear that at this time Dauber was taken by the two police officers and put in the back seat of their squadrol. The police testified that at that

time they noticed he was bleeding from the head and that Officer Loonam called the hospital on the car radio to tell them that they were bringing in Dauber for them to look at. It seems to be the theory of the People that the head wounds were caused when the complaining witness was struck with a night stick. As was noted above, the officers deny that Dauber was struck with a night stick, and they both testified that they did not know how Dauber came to be cut in the head.

We find nothing here that strengthens the People's case. We point out once more that the People did not establish by adequate proof that Lees and Loonam were the first aggressors. A perfectly adequate explanation of how the injuries were incurred can be made by suggesting that he was injured while resisting lawful arrest. While we must point out that we cannot say that the appellants proved their version of the arrest, we also note that they do not have to prove their case. The question is whether the People proved beyond a reasonable doubt that these police officers were guilty of aggravated battery.

The final episode in the events surrounding this arrest took place when the police arrived at the hospital with Dauber. Dauber claims that once they arrived at the hospital, the police began beating him again, and insists that he was not resisting arrest. The officers testified that when Dauber got out of the car at the hospital, he struck Officer Lees and ran into the hospital and attempted to flee to the street through another set of doors. Dauber said he was simply trying to escape another beating.

If the police officers were going to abuse a handcuffed prisoner, they would not take him to the hospital to do it. In fact, had the officers been the first to attack the complaining witness on Western Avenue, it is more likely than not that they would try to con-

ceal the fact that the prisoner was injured while in their custody rather than take him to the hospital for treatment.

The People point out that since the complaining witness was handcuffed, he could not have been the one to attack the officers when they arrived at the hospital. Such a conclusion is not necessarily true. The People have not shown that the officers beat the complaining witness while outside the hospital. They had the burden of establishing this beyond a reasonable doubt; this they failed to do.

Finally, it was conceded by all parties that there was a fight in the hospital. Dauber testified that he was punched, beaten and kicked while at the hospital. The officers stated that they did subdue the complaining witness because he was trying to escape from their custody. A nurse at the hospital, Ethel Kasiewicz, testified that she was on duty at the hospital that morning. She stated that she saw Dauber run into the hospital with the policemen running in after him. She says that Officer Loonam struck the complaining witness two or three times, and she noted that Dauber was handcuffed at this time. According to the nurse, Dauber then fell to the floor and the policeman, Loonam, knelt down and began pummeling him in the face with his fist. She also said she saw the policeman kick Dauber. The police denied that this took place. They insist that they wrestled Dauber to the ground and that he was struggling all the while.

■ We note that the physical acts involved in the two versions of what occurred in the hospital are extremely similar: A man was being chased by the police and the police subdued him. The nurse of course could not say whether the complaining witness was running in an effort to escape police custody or in order to avoid a beating at the hands of these officers. While there is some discrepancy as to the amount of force used to subdue the complaining witness, it is clear

264

that the police may use whatever force is reasonably necessary to sustain a lawful arrest. Ill Rev Stats 1963, c 38, § 7–5(a). The evidence shows that these officers were doing what they reasonably thought necessary to effectuate a lawful arrest.

The Court below seems to have put a great deal of emphasis on the nurse's testimony. She was, he pointed out, a completely impartial witness, and her testimony did not coincide with that of the police officers. But even assuming that she remembered everything accurately and exaggerated nothing, her testimony did not establish the commission of aggravated battery unless the police officers were striking the complaining witness without just cause. If the complaining witness was in fact trying to escape from police custody, rather than escape abuse at the hands of the appellants, the police were justified in using whatever force they reasonably believed necessary to subdue Dauber. If it is true, as they claimed, that Dauber began to fight with them at the time they told him he would have to come down to the station with them, they were justified in using enough force at the hospital to make sure he remained under arrest.

We do not mean to say in this opinion that if Dauber began to fight with the police that they would be given *carte blanche* to beat him as much as they liked. This is clearly not so. The police do, however, have the right to use whatever force is *reasonably necessary* to subdue a person who is resisting arrest.

We are of the opinion that the People did not prove beyond a reasonable doubt that the police officers were the first aggressors, or that the policemen used excessive force in effectuating a lawful arrest. The judgment is reversed.

Judgment reversed.

BURKE, P. J. and LYONS, J., concur.