**People of the State of Illinois, Appellee,
v. William Eyre, Appellant.**

**Gen. No. 51,342.**

First District, Third Division.

May 4, 1967.

DEMPSEY, J., dissenting.

Charles Locker, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Ronald Sandler, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court.

Defendant appeals from a judgment of guilty of the charge of battery and a fine of $50.

The defendant contends that the evidence failed to prove the defendant guilty beyond a reasonable doubt; that the court erred in failing to allow questions concerning former wrongful acts or conduct on the part of the complainant and directed toward the defendant, and that the court erred in failing to take into consideration or allow questions concerning the violation of curfew by complainant at the time of the occurrence.

For a proper understanding of the case it will be necessary to set forth the testimony of each witness. Four witnesses were called by the State, including the complainant, and four witnesses, including the defendant, were called and testified on behalf of the defense.

The complainant, Vincent Kunicki, who was sixteen years of age, testified that at 10:45 p. m. on August 22, 1965, he was walking on the opposite side of the street from the defendant's home on North Wayne Avenue in Chicago. He heard someone call his name and he looked up to the second-floor window across the street and saw that it was a boy named Pat. The complainant was with Daniel McKay and George Bevins. The boys on the street started talking to their friend Pat and the defendant came to the window on the first floor at 6333 North Wayne Avenue. The defendant told the complainant to keep moving. The complainant testified that he then said, "This is public property," and that defendant then called him a "dirty, rotten hillbilly." Complainant stated that he and his friends started to cross the street and the defendant grabbed him around the back of the neck and pushed him over between the houses, and started choking him. The defendant then slapped the complainant with his open hand on the left side of the face. The complainant testified that the defendant hit the complainant five or six times and that the next thing he

knew he was on the ground. He testified that he knew the defendant prior to the time in question; that the defendant had been his landlord at 6333 North Wayne Avenue. He stated that he saw a doctor right after the occurrence and that he had an internal injury. His testimony further indicated that he had been kicked on the left side of his hip. He said he did nothing to provoke the defendant.

Complainant testified on cross-examination that he knew the defendant prior to this occasion; that the defendant had served his family with a notice of eviction prior to this happening and that his family was also served with a notice to pay $300.

The complainant was asked if he had shot beebees at the defendant's window prior to that time, to which he answered that he had not. However, he said that he had been arrested for shooting beebees through the window. An objection was made and the court struck the testimony.

Complainant was also asked if he knew what time the curfew was in the city of Chicago, to which he answered that he did know.

Complainant's testimony further indicated that at 10:45 p. m. on the date in question he was going to pick up a girl friend. He stated that when he was talking to Pat (Patrick Maloney, who was a defense witness) he did not see Mrs. Eyre, nor did he say anything to her. He stated that Pat left the window and Mr. Eyre told them to get off the street and keep moving.

Daniel McKay, one of the teenagers who was with the complainant, testified that he attended high school, and that on the date in question he had seen the defendant; that the time was approximately 11:00 p. m. This witness testified that Pat Maloney called to them from the second-floor window across the street; that he then left the window for a minute and Mr. Eyre knocked on his window and told the complainant and his friends to get

126

off his property. The complainant told Mr. Eyre that this was public property, and they then started to walk toward the curb. When the witness was in the middle of the street Mr. Eyre came out. He called the complainant a hillbilly a couple of times and some words passed between them. According to this witness, Mr. Eyre grabbed the complainant, he thought, around the neck. Vincent was trying to get away. Mr. Eyre was pulling him and Vincent was yelling "help." When Vincent got away he slipped on the sidewalk and Mr. Eyre ran over to him and kicked him in the side. He testified that Vincent was bleeding from the mouth and nose, and the police were called. He testified that Mr. Eyre told the boys to get off the sidewalk and that he was swearing at them. He also testified that "Once Vincent swore at Mr. Eyre," and "When we got back home, he said something to him." He also testified that Vincent did not say anything to Mr. Eyre when this occurrence took place. The witness was asked if he heard the complainant swear at Mrs. Eyre and he testified that he did not see Mrs. Eyre.

Leona Ignoffio testified that she was sixteen years old and was a junior in high school. She was babysitting at approximately 10:45 p. m. across the street from 6331 North Wayne Avenue; that the complainant and his two friends came over to see what happened to her because she was two hours late. The complainant was crossing the street to go back home and she saw Mr. Eyre come from the building and they were yelling at each other. Mr. Eyre called Vincent a "dirty, rotten hillbilly." She saw Mr. Eyre kicking the complainant. She recalled it was in the hip but she did not recall which hip. She did not hear the complainant swear at Mr. Eyre. She also testified that it was possible that part of her view was obscured by a tree. She was at the side window when the fight took place and could see it because she had her glasses on; she saw part of the fight.

She knew the boys had come to pick her up because her mother had called her about forty-five minutes before the complainant came over.

A police officer testified that he arrested the defendant; that the complainant had bruises on his elbows and his lip was swollen. The defendant admitted striking the boy. He testified to the following:

"Q. Were there any marks or bruises on him?
"A. No, I didn't notice.
"Q. Did you notice if his glasses were broken?
"A. He claimed they were. He didn't have them on. He didn't have any marks about his face.
"Q. He didn't have any marks about the face?
"A. He didn't bring it to my attention.
"Q. You didn't see any?
"A. No."

Carol Eyre, the wife of the defendant, testified that at about 11:00 p. m. on August 22, 1965, she went to the sun parlor window at 6331 North Wayne to close the blinds. Danny, one of the boys with the complainant, had a match in his hand. They were walking. The complainant turned around and faced her. She went next door to 6333 in the same building where her husband was working and told him what happened. She then walked to the sun parlor of the apartment and saw them coming back, and she called to her husband to tell him that they were coming back. The complainant at that time was standing on the parkway. The defendant said to Danny, one of the boys with the complainant, "Don't light that." The complainant moved on the sidewalk and saw Mrs. Eyre in the window, as well as her husband. The complainant swore at them. The words he used were "You bastard." Her husband then went out the door of the apartment and she saw the complainant kicking and hitting her husband. She went to the phone to call the police. She saw bruises on the side of her husband's

128

face. She did not see her husband strike the complainant or anyone else. Her husband is thirty-seven years old, about 6'2" tall and weighs about 190 pounds. She stayed inside while her husband went outside. At that time they were in the parkway. Vincent hit her husband with a closed fist. The first blow or two did connect with her husband. At that time she went to call the police.

The defendant testified that he is an engineer by occupation. On the evening in question he was working in the bathroom on the first floor of the apartment next door to his in the same building. He is the owner of the building. His wife came in and mentioned that some boys were in front of the building and they were going to light firecrackers, but she mentioned that they had moved. A few minutes later she called to him from the sun parlor of the apartment he was working in. He looked out the window and saw the complainant standing outside. He also saw Danny McKay. He had something that looked like a firecracker in one hand and in the other hand he had something that looked like a match. It looked as if he were going to light the firecracker. The defendant called out, "Do not light any firecracker." He told the complainant and his friends to move on. Danny McKay immediately moved on. As the defendant was turning to go back to his work the complainant said to defendant's wife, "Fuck you bitch." The defendant then went out the door and told the complainant to keep moving. He reminded him it was past curfew. The defendant then testified, "He aimed at me. I tried to grab the other arm but couldn't. He was hitting me with his free arm. I pushed him with my foot to get him off balance. George Bevins grabbed him and held him in a full Nelson. He wanted to attack me again. At this point I told George Bevins, 'Let him go.' " (George Bevins was one of the complainant's friends.) Defendant said that he did not at any time, other than in self-defense, strike the complainant, nor did he tell

the arresting officer that he struck the complainant; that if he did, it was in self-defense. The complainant hit the defendant approximately five or six times while the defendant was trying to hold him off. The complainant struck the defendant across the face on both sides of the face. The defendant was trying to hold the complainant off and the complainant continued hitting the defendant. The defendant turned to push him off balance with his foot.

Patrick Maloney, a witness called by the defense, testified that he lived in one of the apartments in the building; that he was in the apartment at the time of the occurrence. He called Vincent from his window. He testified that he exchanged a few words with the boys and the defendant told the boys to keep moving. "They said something and Mr. Eyre put his hand on his shoulder." The complainant then started swinging at the defendant and the defendant started to hold the complainant back. The defendant restrained the complainant. The complainant moved back and slapped Mr. Eyre. The complainant called for George, his boyfriend, across the street. When George came over he restrained the complainant from hitting Mr. Eyre. Maloney further testified that he did not at any time see the defendant hit or try to strike the complainant. Patrick Maloney was the friend of the complainant who called to the complainant from his front window when the complainant and his two other friends came walking down the street. He persisted in his testimony that the complainant was the aggressor and did strike the defendant.

Cathy Maloney, a witness called by the defense, testified that she lived at 6333 North Wayne. She knew the defendant and the complainant. She was twelve years of age. She testified that on the evening in question she heard voices in the gangway and went to the window to see what was happening. Mr. Eyre was outside and told the complainant to keep moving. The com-

130

plainant said, "Okay, Bud." The complainant said, "My father can beat you up." The defendant said, "All right, we'll go and see your father." They then started walking and the complainant hit the defendant. She did not at any time see the defendant hit the complainant. She further testified the defendant did not put his hand on complainant, also that he did put his hand on complainant, and that the complainant struck the defendant—he hit the defendant on the chin.

The defendant's first point is that the evidence failed to prove the defendant guilty beyond a reasonable doubt. Four witnesses, including the defendant, testified on behalf of the defense. The uncontradicted facts are that on the evening of August 22, 1965, the complainant, Vincent Kunicki, with two companions, appeared in front of the defendant's home at about 10:45 or 11:00 p. m. The complainant and the defendant were apparently not on good terms due to some previous hostility between the defendant and complainant's family. The complainant and his companions engaged in a conversation with a friend of theirs, Patrick Maloney, who lived on the second floor. The complainant was in front of the defendant's house and the defendant requested him and his companions to move.

The testimony of the police officer was merely to the effect that he noticed the complainant had bruises on his elbows and his lip was swollen. The police officer, when asked if there were any marks or bruises on the defendant, stated there were none and that he did not see any, and when asked if the defendant's glasses were broken, he stated that he did not have them on. The defendant did not bring to his attention any marks about his face. The police officer also testified that the defendant admitted striking the boy. This, of course, was denied by the defendant at the time he testified, and he stated that at no time did he hit the boy, excepting possibly in self-defense. The testimony, therefore, of

131

the police officer and the defendant cannot be said to be conflicting in that respect, because the police officer at no time stated that the defendant struck the first blow.

The testimony of the defendant, his wife, Patrick Maloney, who was a friend of the complainant and his companions, as well as the testimony of Cathy Maloney, a twelve-year-old girl, were entirely contradictory to the testimony of the complainant, his girl friend, Leona Ignoffio, and Danny McKay, one of his companions on the night of the occurrence. If this were the only testimony in the record it could readily be said that the rule of law to be followed is that it is the function of the trial court to determine the credibility of the witnesses and the weight to be afforded their testimony, and where the evidence is merely conflicting, the reviewing court will not substitute its judgment for that of the trier of fact. People v. Clark, 30 Ill2d 216, 195 NE2d 631. However, there are additional circumstances in this record which we believe the trial court overlooked. The defendant testified that George Bevins restrained the complainant after the complainant had assaulted him, and his testimony was supported by Patrick Maloney, who was a friend of the complainant. Patrick Maloney testified that Vincent, the complainant, called for George Bevins and George came over and restrained the complainant from hitting Mr. Eyre. This evidence would tend to indicate to us that the aggressor was the complainant, for, if he were not the aggressor, why would one of the complainant's companions on that evening instead of going to the aid of the complainant, place a full Nelson on the complainant to prevent him from striking the defendant.

George Bevins, the complainant's companion on that evening, who restrained the complainant, was not called as a witness by the State, nor was his absence explained in any way. At least his absence should have

132

been explained in order to overcome any inference, which could be drawn, that the complainant was the aggressor.

■ Another important element arose during the testimony of Mrs. Eyre. She called the police. The question arises as to why she would have called the police had her husband attacked and assaulted, or battered, the complainant in this case.

It must also be remembered that Patrick Maloney, a friend of the complainant, testified on behalf of the defendant to the effect that the complainant struck the defendant first.

While the testimony showed the size of the defendant, there is nothing in the record which discloses the size of the three teenagers involved on that evening.

Section 3–1 of the Criminal Code (Ill Rev Stats 1965, c 38, par 3–1), reads as follows:

> "Every person is presumed innocent until proved guilty. No person shall be convicted of any offense unless his guilt thereof is proved beyond a reasonable doubt."

■ In People v. Semenick, 360 Ill 250, 195 NE 671, at page 254, the court said:

> "While the weight of the evidence is for the court or jury to determine, yet where the verdict of judgment is palpably contrary to the weight of the evidence, or the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of defendant's guilt, it is the duty of this court to reverse the judgment. People v. Holton, 326 Ill 481; People v. Rice, 323 id. 580; People v. Nemes, 347 id. 268."

■ The evidence in this case, together with the reasonable inferences to be drawn, is so improbable and

unsatisfactory as to justify a reasonable doubt of defendant's guilt.

Because of the conclusions we have reached, it will be unnecessary to discuss the other points raised by the defendant.

Judgment reversed.

SCHWARTZ, J., concurs.

DEMPSEY, J., dissenting:

My colleagues find the evidence improbable and unsatisfactory and because of this they have a reasonable doubt of the defendant's guilt. I do not.

The 16-year-old complaining witness, Vincent Kunicki, and his two friends were on the west side of Wayne Avenue talking to a girl who was baby-sitting. The girl's mother was concerned about her. She had telephoned her daugher 45 minutes earlier to find out why she had not come home. Her daughter was delayed because the baby's mother had not returned. It was approaching 11 p. m., the baby's mother was then two hours late and the boys went to check on the girl. While they were talking to her, Patrick Maloney, who lived on the second floor of the defendant Eyre's building on the east side of Wayne and who was a friend and former neighbor of Vincent, called to them from his bedroom window.

Vincent and one of the boys crossed the street to talk to Maloney. They did not approach the defendant's building menacingly. There is no evidence to support the Eyres' suspicion that they possessed firecrackers and intended to use them or anything else upon the Eyres' property. They were quiet and orderly. Maloney, a witness called by the defendant, testified that while they were talking Eyre came out of the building and told Vincent, who was doing nothing, to keep moving. Vincent replied, "Okay, Bud," and Eyre put his hand on

Vincent's shoulder and said, "Come on. Let's go." Vincent *then* started swinging at Eyre.

The defendant was charged with the offense of battery. A person commits battery if he intentionally or knowingly without legal justification makes physical contact of a provoking nature with another person. Ill Rev Stats 1965, c 38, § 12–3(a). The defendant committed this offense. He made physical contact of a provoking nature with the complainant when he seized the boy by the shoulder and told him to get going.

That Eyre did this was established by the testimony of four of the seven eyewitnesses—two of them his own. A fifth eyewitness said he started the altercation. Eyre himself impliedly admitted seizing the boy by one arm and holding on to it before a blow was struck. He testified:

> "So I went out the door. I told him to keep moving. I reminded him that it was past curfew. He aimed at me. I tried to grab the *other* arm but couldn't. He was hitting me with his free arm."

Vincent, a third-year high school student, was on a public sidewalk. He had a lawful right to be where he was. He was doing what he had a perfect right to: talking to a friend and old neighbor. When Eyre grabbed his shoulder and told him to move on, he had a right to stand his ground and to repel force with force. Section 7–1 of the Criminal Code states:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself . . . against such other's imminent use of unlawful force."

Ill Rev Stats 1965, c 38, § 7–1. People v. Bush, 414 Ill 441, 111 NE 326 (1953) ; People v. Motuzas, 352 Ill 340, 185 NE 614 (1933).

135

The force used by Vincent in defending himself against Eyre's unlawful use of force seems to have been ineffectual. Eyre said he was hit on both sides of the face, and his wife said there were bruises on his face. But the only impartial witness, the police officer who had been summoned to the scene, saw neither marks nor bruises on him. On the other hand, the force used upon the boy by the 37-year-old defendant who weighed 190 pounds and who was six feet, two inches tall, is shown by the boy's condition when the quarrel ended. He was bruised, bleeding from the mouth and nose and was suffering from an internal injury which required a doctor's care.

The trial court was fully justified in finding that a battery was committed by Eyre who, under the prodding of his wife, stormed out of his building, accosted the boy, grabbed his arm and told him to get off the public sidewalk. Although what took place afterwards had no bearing on the initial offense the court also would have been fully justified in believing that after the fisticuffs started, Eyre was the continuing aggressor, that he dealt the damaging blows, pushed the boy to the ground and kicked him in the side while he was down.

At the very least, it was the trial court's province to determine whom to believe. The testimony of those who witnessed the occurrence differed in some respects—depending upon their vantage points and viewpoints. This conflicting testimony alone would make the case one for the trier of fact. I find no reason for placing this court's evaluation of the testimony above that of the trial court who had every advantage in observing the witnesses and in determining their credibility.