THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JEFF FORT, Defendant-Appellant.

(No. 54227;

First District—July 1, 1971.

474

Marshall Patner, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Michael J. Goldstein, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Jeff Fort and Paul Martin were jointly charged with the offense of battery (Ill. Rev. Stat. 1967, ch. 38, par. 12—3) upon the complaint of the alleged victim, Travis Davis. The case was tried before a jury which returned a not guilty as to defendant Martin and found defendant Fort guilty as charged. Defendant Fort, the appellant in this case, was sentenced to six months confinement at the Illinois State Farm at Vandalia.

Defendant raises the following issues on appeal: First, can a conviction for battery stand where the only evidence for the State was the testimony of complainant who was himself facing a battery charge, and where the jury rejected complainant's testimony, and where defendant and others testified that complainant was the aggressor. Second, does the constitution permit a black defendant to be tried by a jury which included one black juror so as to appear to satisfy constitutional requirements and from which all other prospective black jurors were excluded by use of State's peremptory challenge because they were black, and

which was selected under rules which systematically underrepresented the peer group of defendant in jury panels. Third, should the conviction of defendant be set aside because he was arrested, charged and tried without any prior judicial or quasi-judicial determination that there was probable cause against him and not against Davis and because the State has knowingly and intentionally refrained from prosecuting Davis. Fourth, was the overall conduct of defendant's trial so unfair and prejudicial as to warrant reversal.

We affirm.

Because of the various issues raised in this appeal, we will begin by examining the evidence introduced at trial.

Travis Davis is the complaining witness. He testified that on October 29, 1968, at 5:15 P.M. he looked out the window of his apartment and saw a light on in his automobile. He immediately went out of the building and saw a young boy going through the car. The boy began to run and Davis pursued him, catching him a few blocks later. Davis then, while holding the boy by his arm and the front of his insulated jacket, attempted to locate a patrol car, and when this proved unsuccessful, a public telephone so that he could summon the police. The quest for an unoccupied phone brought Davis and the boy to the Wonder Food Store. While he was outside waiting for a phone, a crowd began to gather. Fort approached him and asked what he intended to do with the boy to which he responded that he was holding him for the police. The boy's mother approached him and asked that the boy be let go. He refused to do so until such time as the police would arrive. When the boy's mother attempted to tug her son away from Davis, Fort yelled, "Let's get the M—— F——!" then attacked him from the left side. Mr. Martin and others joined in the attack. Davis was pushed through a plate glass door, cutting his backside. Davis was being dragged, while being beaten, into 67th Street. He tried to hold on to somebody to keep from falling down, and ended up clutching defendant Fort's leg. Mr. Fort was beating him about the head at that time, but Mr. Martin's whereabouts were then unknown to him. When the police arrived, Davis was on his knees and was being pummeled by Fort. Upon the police command "Let him go!", he released Fort's leg. He never struck Fort or Martin. Davis was hospitalized for three days. On cross-examination, Davis noted the unusual garb of Martin on the day of the battery (cashmere overcoat, huge gold earrings) but admitted that he did not give the police a description of Martin when first brought to the police station.

Raymond Smith was the police officer who arrived on the scene of the disturbance. Smith testified that he proceeded to the Wonder Food Supermarket in regard to a call that a boy was being held for the police.

Upon arriving he was confronted by a large crowd of 100 or more people, and a smaller group of males who were beating someone unidentified at the time. Upon command all the aggressors but Fort fled. Fort continued to strike Davis until Smith placed his revolver to Fort's head. Davis was bleeding, and his clothes were torn; Fort's clothing seemed rather orderly and untorn, and he was not bruised or bleeding. Martin was not seen by Officer Smith when he arrived.

At the station, Oliver Reed, the boy that Davis was holding for the police, was examined by Smith who did not notice any bruises or marks about the boy's neck. Both the boy and his mother refused Smith's offer to procure medical attention for him.

Oliver Reed testified for the defense that Davis grabbed him "around the coat and the collar and the neck" and dragged him around the corner. Oliver had trouble breathing. Oliver's sister, Madeline, his mother, and others asked Davis to release him. Oliver denied being in Davis's car.

As to the location of the disturbance, Oliver testified that Fort was present, that Fort asked Davis to let Oliver go, that Oliver did not hear Fort use any swear words, that Davis swung out at Fort, knocked him against the window and then knocked him into the street.

On cross-examination Oliver testified that he knew Fort and Martin from the neighborhood and that they were his friends.

Madeline Reed is Oliver Reed's sister. She testified for the defense that she first saw Davis dragging Oliver down the street, and that Oliver was "hollering and crying—trying to fight back." She asked Davis to let her brother go. He hit her hand and told her he was taking Oliver to the police. She then went to get her mother who went with her to the Wonder Food Store. She heard Fort say to Davis, "Let him go. His mother is standing here, and we will wait for the police." She never heard Fort swear. Somebody then grabbed for Oliver's coat and Davis swung. "Everybody jumped him."

Mrs. Rena Reed is Oliver's mother. When she arrived at the Wonder Food Store she saw her son standing with Davis who had his hand around Oliver's neck. She asked Davis to release him until the police came. Davis replied, "Before I let go I will die, and if anybody touches me, this kid * * * I will kill him." People were politely trying to get Davis to let go of the boy. She didn't hear any "bad words." All at once a fight broke out. She was pushed back into the crowd and couldn't tell who was involved.

Defendant, Jeff Fort, testified that he was driving to the Wonder Food Store to shop. When he stepped out of his car, he noticed what appeared to him to be a man beating his son. A girl ran up to the man and asked him to let her brother go. Fort then asked the man (Davis) to stop

choking the boy. Fort tried to give Davis literature to distract him, but Davis refused to be distracted. Mrs. Reed arrived and pleaded with Davis to release her son. Davis refused. Fort never used improper language, nor did he ever swing at Davis. Davis hit Fort with his arm, driving Fort into the glass door after which Fort was dizzy. Davis then grabbed Fort around the waist and pushed Fort into the street. Fort tried to free himself by pushing Davis away. Both halted when the police arrived.

On cross-examination Fort testified that he was a gym instructor at the First Presbyterian Church.

Reverend Paul Martin testified on direct that he was wearing his ministerial attire on the day of the occurrence. He was wearing "big round earrings." He did not strike or otherwise make contact with Davis.

Defendant first alleges that Davis's testimony implicating Fort and Martin equally in the storefront episode was not believed by the jury. In making this argument defendant Fort tries to separate the facts of the incident into two distinct occurrences: one immediately in front of the Wonder Food Store and the other further out in the street. Thus, he argues that the jury disbelieved Davis's testimony as to the storefront occurrence in that Martin was acquitted and, further, that Officer Smith's testimony as to the street occurrence is silent as to the identity of the aggressor.

We must first reject the defendant's dichotomy of the incident. From Fort's testimony alone, we see a continuous series of events which led to Fort's being tried for battery. Attempting to distinguish the incident as defendant does (*i.e.*, front of store versus street), can only serve to cloud the issue.

That being the case, we must consider the effect of Martin's acquittal upon Fort's conviction. The recent case of *People v. Jones*, 132 Ill.App.2d 623, sheds light on this problem. There the court stated:

> "The rule is that where a verdict is reversed for inconsistency in such cases, the verdicts must have been based on precisely the same evidence, identical in all respects as to both defendants."

The court went on to quote with approval *People v. Edwards*, 81 Cal. App.2d 655, 661 as follows:

> "When there is the slightest difference in the evidence as between two persons jointly tried the trier of facts may weigh the evidence and make allowance for such difference, and when that is done and one is acquitted and the other convicted, the fact that the evidence involves the acquitted person to some extent will not require the exoneration of the other."

■■ Applying the rule of *Jones* to the case before us, we see that the defendant Fort's argument must fail. We find a great difference in the

evidence presented as against Fort and Martin. The evidence against Martin was simply that Davis saw him there and that Martin struck Davis. No mention of Martin was made by Davis at the police station immediately after the incident, nor was any description given in spite of Martin's distinctive appearance. Again, Martin's distinctive appearance may have caused him to stick in Davis's memory and thus led him to be later erroneously identified as an assailant. Martin categorically denied ever striking Davis. Fort, on the other hand, admitted to "pushing" Davis. Davis's testimony involves Fort in the incident in a much more tangible way, and Fort's testimony as to the occurrence substantiates this. Also, there is the testimony of Officer Smith that upon his arrival Fort was striking Davis about the head, but that he never saw defendant Martin at the scene. The jury, by their verdict, determined that Martin was not proven guilty beyond a reasonable doubt, but that Fort was. Because of the difference in evidence as between the two defendants, we do not find that the jury's verdict was inconsistent so as to require the reversal of defendant Fort's conviction.

Defendant Fort next argues that Davis's testimony about the street episode showed no more than that Fort was protecting himself from Davis who had seized him. This argument appears to be predicated upon the theory that, first, there were two distinct episodes involved in the trial, a theory which we discounted above, and second, that the credibility of Davis's testimony as to the initial encounter between Fort and Martin has been permanently undermined by Martin's acquittal. We do not find this latter point convincing. The fact that the jury found Martin not guilty has nothing to do with its assessment of the credibility of Davis when testifying as to Fort's involvement in the incident. The jury, as the trier of fact, obviously accepted Davis's description of the occurrence. Thus, when viewing the entire occurrence, they found that Davis seized Fort to protect himself from the blows being rained upon him, rather than, as Fort alleges here, that Davis seized him without provocation and that Fort was merely defending himself.

Defendant Fort next asserts that Officer Smith's testimony had no bearing upon the identity of the aggressor. We fail to see how this could change the jury's finding. Smith's testimony showed only that at a certain point Davis was on his knees clinging to Fort's leg, that Fort was beating Davis about the head, and that Fort did not stop until Smith's revolver was placed to Fort's head. The identity of an "aggressor" could only be gleaned from the witness's description of how the beating originated. We reiterate that the evidence showed one continuous chain of actions, and we reject defendant's attempt to discuss the facts as two separate occurrences.

Defendant argues in the alternative that even if the jury did believe Davis's version of the facts, that the conflict in testimony between defendant Fort and complainant Davis as to the identity of the first aggressor creates, as a matter of law, a reasonable doubt as to the guilt of defendant. He cites the cases of *People v. Eyre* (1967), 83 Ill.App.2d 123, 227 N.E.2d 120 and *People v. Lees* (1965), 60 Ill.App.2d 254, 208 N.E.2d 656 as authority for this proposition. A careful reading of these cases shows them distinguishable from the case at bar. Both cases contain testimony which, standing alone, raises serious doubt as to the validity of the verdicts. Thus, in *Eyre* and *Lees,* the courts found that beyond mere contradiction, which may rightfully be resolved by the trier of fact, evidence was present that was so improbable or unsatisfactory as to raise a serious doubt as to the defendants' guilt.

However, the court in *Eyre* stated at page 132:

"[I]t is the function of the trial court to determine the credibility of the witnesses and the weight to be afforded their testimony, *and where the evidence is merely conflicting, the reviewing court will not substitute its judgment for that of the trier of fact.*" (Emphasis added.)

An examination of the record before us discloses no such paucity of credible evidence as to cause a reversal of this case. The evidence as to the incident is admittedly contradictory as between the defendant and the complainant. However, the triers of fact, after hearing all of the evidence, and studying the demeanor of the witnesses, resolved the issue. Thus, defendant is incorrect in his allegation that such a contradiction warrants reversal as a matter of law.

The defendant next raises a series of constitutional issues, which are concerned with the makeup of the jury. He does this by asserting that: 1) Persons were excluded from the jury by peremptory challenges because they were members of the Negro race. 2) The jury was selected upon the basis that a certain portion of jurors of the Negro race would satisfy the constitutional requirements. 3) The jury was selected from persons who were not the peers of the defendant. We shall answer these assertions seriatim:

1) Defendant begins his argument with the claim that *Swain v. Alabama* (1965), 380 U.S. 202 stands for the principle that exclusion of Negroes by the State's peremptory challenges amounts to unconstitutional discrimination. We feel that the rule of *Swain* is much narrower than defendant would urge. The court in *Swain* observes that, "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's

control." (*Swain* at page 220.) With this in mind the court continues at page 221:

"* * * [w]e cannot hold that the striking of Negroes in a *particular* case is a denial of equal protection of the laws. In the guest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, pro tanto, would no longer be peremptory * * *.

In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. *The presumption is not overcome and the prosecutor therefore subjected to examination by allegation that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes.*" (Emphasis added.)

Actually, the equal protection argument could only be properly raised when the allegation is made that the prosecutor in the county "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes * * * with the result that no Negroes ever serve on petit juries * * *." *Swain* at page 223.

■■ With this language in mind we find that the defendant fails here for three reasons: First, it can be seen from the record that a Negro did in fact serve on the jury and hence there is a showing that *all* Negroes were not prohibited from jury service here. Second, defendant's allegations are specifically addressed to discriminatory exclusion of jurors in the instant case, and his failure to allege elimination of all Negro jurors throughout the county places him outside of the scope wherein *Swain* would find a justiciable case of discrimination. Third, nothing in the record convinces us that the Negroes challenged were so challenged on the basis of their race. See also *People v. Butler* (1970), 46 Ill.2d 162, 263 N.E.2d 89.

2) Defendant predicates his allegation that the jury was selected on the improper basis that a certain low percentage of black persons upon

it would satisfy constitutional requirements on the following statement of the State's Attorney:

"Let the record show that Mr. Spencer has been accepted by both sides as a member of the first panel of this jury and is to all appearances a Negro."

This statement was made during a hearing where the issue of discrimination was being argued before the trial judge. It was part of the State's unconditional denial that it was acting discriminatorily. Defendant would have us construe the State's Attorney's motives in such a manner that his statement indicates the willful establishment of a quota for Negroes. We must decide this case upon the record, and the record is silent as to any such motive on the part of the State's Attorney. This issue is without merit.

3) Defendant argues that the jury was unrepresentative of the community from which defendant came, and in which the alleged "altercation" occurred. Defendant reasons that a jury drawn from the County of Cook, rather than the First Municipal District, is, of itself, unrepresentative of the community wherein defendant resides (*i.e.*, the South Side of the City of Chicago), and that thus, defendant was not tried by his peers.

■■ We might first observe that trial by one's peers refers to fellow citizens, not ethnic or racial persons. (*Newland v. Marsh* (1857), 19 Ill. 376.) The law requires that these "fellow citizens" who serve on a jury not be chosen in a discriminatory manner.

"[A] defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which the jurors are drawn. [cites.] Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportional strength of every identifiable group. 'Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation * * *.'" *Swain v. Alabama*, 380 U.S. at 208.

■■ We do not find that selection of jurors from Cook County is accomplished in a discriminatory fashion. That being the case, defendant must fail in his allegation, for the County of Cook is a reasonable geographic area from which to draw jurors. Even if jurors were to be drawn only from the City of Chicago, there is nothing to guarantee that a citizen from the North Side of the City would not be tried before a jury of South Siders, or vice versa.

Defendant next alleges that we should set aside the conviction because he was arrested, charged and tried without any prior judicial de-

termination and there was probable cause against him and not against Davis, and because the State has knowingly and intentionally refrained from prosecuting Davis. Defendant urges that when the police first appraised the situation, they were unable to determine who was the "first aggressor," that the police arbitrarily chose to enforce the State battery law against Fort rather than against Davis, and that defendant was therefore deprived of equal protection of the law.

Defendant's theory addresses itself to selective enforcement of non-discriminatory laws. The theory is not a novel one, and its development can be seen as originating in the case of *Yick Wo v. Hopkins* (1886), 118 U.S. 356. (See comment, Equal Protection as a Defense to Selective Enforcement by Police Officials, 14 J. Pub. L. 223 (1965); Comment, The Right to Nondiscriminatory Enforcement of State Penal Laws, 61 Col. L. Rev. 1103 (1961); Note, Discriminatory Law Enforcement and Equal Protection from the Law, 59 Yale L. J. 354 (1950).) *Yick Wo* set down the rule that citizens are constitutionally protected from discriminatory administration of the law. Thus, a licensor of businesses cannot withhold a license from a party on the basis of race, for all citizens have an equal right to such licenses subject to such non-arbitrary standards as might be appropriate. In applying the reasoning of *Yick Wo* to instances of alleged selective enforcement of nondiscriminatory penal laws, the jurisdictions have been split, Illinois being among the group that finds the reasoning non-applicable. Thus, in the case of *Jackie Cab Co. v. Chicago Park District* (1937), 366 Ill. 474, 9 N.E.2d 213 the plaintiff sought an injunction to restrain the police department from arresting plaintiff's taxi drivers in that the ordinance under which the arrests were being made, an ordinance which prohibited the picking up of additional passengers once a trip was initiated, was being enforced only against Negro cab drivers. The court found first that the ordinance was constitutional and then continued at page 477:

> "The regulation being valid, there remains the sole question as to whether the allegations of the complaint charging discrimination against colored drivers operating taxicabs over the boulevards of the Chicago Park District present a condition which is subject to relief in a court of equity, and if so, whether the allegations are sufficient to entitle the plaintiffs to the relief sought. It becomes apparent, at the outset, that if a court of chancery should grant the relief prayed to the colored drivers, then the white drivers of taxicabs operated by other corporations and companies would also be entitled to seek the protection of the same court in so far as their right to pick up passengers, contrary to the express intention of the first occupant, was concerned. In such an event the result

would be the nullification of a valid constitutional regulatory ordinance."

■■ Upon reflection, the distinction which the Illinois courts drew is that in the *Yick Wo* type of case, unreasonable discrimination that interferes with the exercise of an existing right is prohibited, whereas in a case such as *Jackie Cab Co.* there is no constitutional right to violate a penal law which is non-discriminatory on its face. See also *Mister Softee of Illinois, Inc. v. City of Chicago* (1963), 42 Ill.App.2d 414, 192 N.E.2d 424.

■■ However, even if we were to accept defendant's theory, we find no evidence of selective enforcemnt so as to amount to a constitutional issue. Defendant claims that the police would not allow him to prosecute his complaint against Davis because Davis had sworn out his complaint first. Defendant appears to have done nothing to further his position for more than six months. At that point (coincidentally the day his trial was to begin), he went before a judge and swore out a complaint. The State's Attorney there testified that he had never been approached by Fort on the matter. Furthermore, we find no evidence in the record that the State ever tried to prevent or prevented a probable cause hearing.

Finally, even if defendant was prejudicial by the State's refusal to prosecute a complaint against Davis, he had his remedy when the judge had such a complaint prepared pursuant to defendant's request.

In the alternative, the defendant asserts that the State's prosecution of him in this instance is violative of the Federal Civil Rights Act (42 U.S.C. § 1983). In so doing, defendant alleges that the State's activities were "part of a concentrated plan to chill plaintiff's [sic] exercise of his rights under the United States Constitution especially those guaranteed by the First Amendment," and cites the case of *Dombrowski v. Pfister* (1965), 380 U.S. 479.

*Dombrowski* allowed for injunctive and declaratory relief where parties were threatened by the State with prosecution under an over-broad state statute. The mere threat of enforcement of the Louisiana Subversive Activities and Communist Control Law, with its chilling effect upon appellant's (Southern Conference Educational Fund) First Amendment right of association, proved an adequate basis for injunctive relief.

We find no indication of any interference with defendant Fort's First Amendment right, and while we approve of the principle of *Dombrowski v. Pfister*, it has no application to the case before us.

The last issue which defendant raises is that the overall conduct of his trial was unfair and prejudicial. He substantiates this by his claim that a) the trial court was in error in failing to give an instruction upon the self-defense of property, b) defendant was tried upon the basis that

he was responsible for the actions of the crowd, c) the cross-examination of Oliver Reed was insulting, irrelevant, and prejudicial, and d) the closing statement of the State's Attorney misstated the substantive effect of the testimony.

a) The defendant complains that the court improperly refused to instruct the jury pursuant to his tendered instruction which followed the theory of Ill. Rev. Stat. 1967, ch. 38, par. 7—3 which reads as follows:

> "Use of Force in Defense of Other Property. A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's trespass on or other tortious or criminal interference with either real property (other than a dwelling) or personal property, lawfully in his possession or in the possession of another who is a member of his immediate family or household or of a person whose property he has a legal duty to protect. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent the commission of a forcible felony."

Defendant's theory here is that he would have been justified in using force against Davis to the extent that he reasonably believed that it was necessary to protect Oliver from Davis's use of unlawful force. See Ill. Rev. Stat. 1967, ch. 38, par. 7—1. In fact, the following instruction was given to the jury:

> "The court instructs the jury that a person is justified in the use of force against another when and to the extent he reasonably believes that such conduct is necessary to defend himself or another against such other [sic] imminent use of unlawful force."

We can see that the character of the force used by Davis in restraining Oliver comes into issue here. Defendant claims that this force should be characterized as that allowable when a party is protecting property other than a dwelling. The facts of this case are different. The testimony clearly establishes that Davis had reasonable grounds to believe Oliver was going through his car, that Davis pursued and effected a citizens' arrest of Oliver, and that Davis made it clear to all observers that he was holding the boy until the police arrived. Thus, the court properly tendered an instruction which read:

> "The court instructs the jury that a private person who makes or assists another private person in making a lawful arrest is justified in the use of any force which he would be justified in using if he were summoned or directed by a peace officer to make an arrest, except that he is justified in the use of force likely to cause death

or great bodily harm only when he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or another."

By so instructing the jury, the Court put into issue the nature of the force Davis was using to restrain Oliver. Evidence as to that force was heard by the jury and decided in favor of Davis. Had the jury found that Davis was using unjustified force upon Oliver, it would have found for defendant under the instruction concerning the justified use of force against another.

■■ The defendant was not entitled to an instruction which would confuse or mislead the jury as to the issue before them. (14a I.L.P. Criminal Law § 686; *People v. Schyman* (1940), 374 Ill. 292, 29 N.E.2d 270.) The instruction tendered by defendant was properly refused.

■■ ■ Defendant argues that he was tried as being responsible for the actions of the crowd. As authority for his claim that this constituted prejudice, defendant cites *People v. Maertz* (1941), 375 Ill. 478, 32 N.E. 2d 169. We must disagree. First, defendant attempts to substantiate this argument by emphasizing the use of the pronoun "they" when the State's witnesses described the incident in front of the Wonder Food Store. He would imply from use of this pronoun that the activities of the crowd were thereby imputed to Fort. This is not so. Both the State's and defendant's witnesses mention the large crowd of people present and its eventual disorderly activity. However, the State specified the activities of defendant for which he was being tried. To assume that the incident could be properly portrayed without reference to the crowd would be folly, and it is mistaken to assume that such reference constituted evidence of defendant's misconduct.

Second, the *Maertz* case is not in point. There the court found prejudicial error in the State's introduction of "voluminous evidence" of the anti-Semitic goals and beliefs of an organization to which the defendants belonged. Defendants were being tried for breaking windows of the Goldblatt store. The court found that the evidence offered was highly prejudicial in that one could not be certain if defendants were found guilty of breaking windows or of belonging to an anti-Semitic organization. In the instant case, while defendant was not being tried for the activity of the crowd, there is ample evidence of the fact that he was a knowing participant in those activities. The evidence of his individual actions is sufficient to support a finding of guilty. There is no reason to believe that the evidence of the crowd's actions, which was necessary to accurately describe the incident, was prejudicial to defendant.

c) The defendant asserts that the following cross-examination of Oliver Reed constituted prejudice and was irrelevant:

MR. SCHREIER: Q. "Oliver, do you know what it means to tell the truth?

THE WITNESS: Yes, sir.

Q. Did you say "No"?

THE WITNESS: A. No.

Q. You don't know what it means?

A. Yes, sir.

Q. I ask this witness' testimony be stricken.

MR. PATNER: The boy said he did know what it was to tell the truth, and he repeated. He did not say "No."

MR. SCHREIER: I ask the court reporter—

MR. PATNER: Ask the boy.

MR. SCHREIER: Ask the court reporter to read it back.

(From the record above, the reporter read the following:

Q. Oliver, do you know what it means to tell the truth?

A. Yes, sir.)

THE COURT: I think you misunderstood the answer in total.

MR. SCHREIER: Q. Oliver, do you know what it means to tell the truth?

THE WITNESS: A. Yes, sir.

Q. You do know?

A. Yes, sir.

Q. What does it mean?

A. It means not to tell any stories when you tell the truth and—

Q. Maybe you can stand up again and we can hear you better.

A. —and it means that not to tell anything—not to put anything else—

Q. Not to put anything else in?

A. Yes, sir.

Q. What happens if you don't tell the truth?

A. You would be telling a story.

Q. What happens to you then? Anything?

A. I don't know.

Q. You don't know."

■■ When Oliver Reed testified, he was thirteen years old. In Illinois a witness is not presumed competent to testify until he is fourteen. (*Shannon v. Swanson* (1904), 208 Ill. 52, 69 N.E. 869.) When a child is under fourteen, his competence is ascertained by examining him as to his intelligence, understanding and moral sense. (*People v. Davis* (1957), 10 Ill.2d 430, 140 N.E.2d 675.) To be competent the child must be "* * * sufficiently mature (1) to receive correct impressions by his senses, (2) to recollect these impressions, (3) to understand questions

488

and narrate answers intelligently, and (4) to appreciate the moral duty to tell the truth (and comprehend the meaning of the oath)." (*People v. Sims* (1969), 113 Ill.App.2d 58, 61, 251 N.E.2d 795.) It was this latter point to which the State's Attorney addressed his remarks, and thus they were not "insulting, irrelevant, or prejudicial."

██ d) Defendant's final argument is that the State's Attorney stated the substantive effect of the testimony in his closing argument. In that defendant did not object to these "misstatements" below, we consider them waived. *People v. Hampton* (1969), 44 Ill.2d 41, 46, 253 N.E.2d 385, 387; *People v. Donald* (1963), 29 Ill.2d 283, 194 N.E.2d 227; *People v. Sinclair* (1963), 27 Ill.2d 505, 190 N.E.2d 298.

Judgment affirmed.

McNAMARA, P. J., and DEMPSEY, J., concur.