**Hursey DAVIS, Petitioner–Appellee,**

v.

**WARDEN, JOLIET CORRECTIONAL INSTITUTION AT STATEVILLE; Michael Lane, Director, Department of Corrections, State of Illinois, Respondents–Appellants.**

No. 88–1590.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 22, 1988.

Decided Feb. 1, 1989.

William P. Postorius, Ill., Atty. Gen. Office, Chicago, Ill. for respondents-appellants.

Peter J. Schmiedel, People's Law Foce., Chicago, Ill., for petitioner-appellee.

Before BAUER, Chief Judge, WOOD, Jr., and FLAUM, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Hursey Davis, a black prisoner convicted of attempted murder and theft by an all-white jury, claimed that the Cook County jury selection system violated his constitutional right to a jury selected from a fair cross section of the community. Both the respondent and Davis moved for summary judgment. The district court granted Hursey Davis's petition for writ of habeas corpus on the motion for summary judgment; the respondent appeals. For the reasons set out below, we reverse the district court's judgment granting Davis's petition for habeas corpus and enter judgment on the motion for summary judgment in favor of respondent.

## I. FACTS

On October 27, 1981, Hursey Davis appeared in the Cook County circuit court located in Des Plaines, Illinois, a northern suburb of Chicago. The State charged Davis with attempted murder and auto theft in connection with the February 13, 1981 shooting of a white Des Plaines police officer.

Prior to trial, Davis's counsel discovered that every person on the jury list was white. The day of trial, Davis's counsel requested that the court question the forty prospective jurors as to how they were selected to serve in the Des Plaines courthouse, or in the alternative, dismiss them. Defense counsel argued that the jurors were not randomly selected. According to defense counsel, the array was composed of people who lived in predominantly white northwest suburbs of Cook County and the predominantly white northwest side of the City of Chicago.[1] He described another Des Plaines criminal trial in which the jurors had been asked if the Des Plaines courthouse was "convenient" for them. The trial court, after listening to Davis's counsel, denied the motion challenging the array and refused to question the prospective jurors concerning the jury selection process. The trial court stated that he found "outrageous" defense counsel's allegation that blacks were excluded from the jury list.

The jury convicted Davis. The trial court denied Davis's motion for a new trial and sentenced him to concurrent terms of fifty years for attempted murder and five years for theft. Davis then appealed, challenging the constitutionality of the jury selection system.

The Appellate Court of Illinois reduced Davis's sentence from fifty to thirty years but rejected Davis's claim that the trial court unconstitutionally deprived him of a jury drawn from a representative cross section of the community. The appellate court found, in rejecting defendant's claim, that the trial court's failure to question jurors did not constitute "reversible error." *See People v. Davis*, 121 Ill.App.3d 916, 77 Ill. Dec. 415, 418, 460 N.E.2d 471, 474 (1984).

After the Illinois Supreme Court denied further review, Davis petitioned the federal district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that the Cook County jury selection system violated his sixth and fourteenth amendment right to trial by a fair and impartial jury.

During discovery granted by the district court, defense counsel deposed Mr. Daniel A. Covelli, Jr., the county jury supervisor in 1981. The county jury supervisor, along with his other duties, assigned persons summoned for jury duty to courtrooms in various parts of Cook County. Covelli did not recall the exact procedure used in Davis's case but outlined the steps he would commonly take: Approximately 750 to 1000 potential jurors reported to the Daley Center in Chicago every Monday for jury duty.[2] At the Daley Center, members of the jury supervisor's staff called at random approximately twice the number of names needed, using a bingo-type machine called a peapot. Covelli's staff then took the prospective jurors to a courtroom where Covelli thanked them for coming and asked those persons living in or near the suburbs to volunteer for jury duty at suburban courthouses. According to his testimony, Covelli said something like, "Be kind to your fellow jurors. It's a large county. If you live close to that area, it would be easier on other jurors." If the suburban court needed more jurors than would volunteer, Covelli's staff picked the rest randomly. Covelli ceased using this system around 1983.

Both sides moved for summary judgment on the petition for writ of habeas corpus. In support of the motion, Davis's counsel submitted the affidavit of statistician Steven Whitman. Whitman, in his review of the composition of the venire in Davis's case, stated that the probability of select-

---

1. Specifically, defense counsel read off the residences of the different members of the venire. Defense counsel did not name the homes of all forty members of the venire, however, and failed to list the residences of all the members in the record.

2. Although Mr. Covelli did not testify as to the exact method used to call prospective jurors to the Daley Center, both parties presume that the potential jurors were randomly selected from

voters' lists. The Illinois statutes order the jury commissioners to summon jurors from voter lists or drivers' license holder listings. Ill.Ann. Stat. ch. 78 ¶ 25 (Smith–Hurd 1987). *See also People ex rel. Lasecki v. Traeger*, 374 Ill. 355, 358, 29 N.E.2d 519 (1940). Because the matter is not in dispute and the statute suggests the potential jurors came from voters' lists, we will accept the parties' presumption.

ing forty white jurors at random from the entire population of Cook County was seven chances in one million. He added, "the selection of this group of forty white people from the population of Cook County, Illinois, is totally inconsistent with a random, racially neutral selection process."

The district court granted Davis's petition for writ of habeas corpus on summary judgment and remanded the case to the state court for a new trial. The district court held that Davis established a prima facie case of systematic exclusion of blacks from the venire, which the respondent failed to adequately refute. The district court then denied the respondent's motion to alter or amend the judgment and the respondent appealed.

## II. ANALYSIS

### A. Supreme Court Precedent

In *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1967), the Supreme Court extended the sixth amendment right to an impartial jury to defendants in state proceedings. Defining the elements of the sixth amendment that extend to the states, the Supreme Court has held "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975); *see also Teague v. Lane,* 820 F.2d 832, 837 (7th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1106, 99 L.Ed.2d 268 (1988). The fair-cross-section inquiry has three components:

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation

is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Once the defendant has made a prima facie showing as to these elements, the burden shifts to the state to show that it has an overriding, significant state interest. *Id.* at 367, 99 S.Ct. at 670.

### B. Distinctive Group in the Community

The parties do not dispute that defendant has satisfied the first prong of the *Duren* test. Under *Duren,* the group excluded from the venire must be distinctive in the community. All agree that blacks are a distinctive group in the community. *See Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880).

### C. Fair and Reasonable Representation of Community

The second prong of the *Duren* test presents greater difficulties. Under this second prong, defendant must prove that the representation of blacks on the jury list is not fair and reasonable in relation to the number of blacks in the community. This element of the *Duren* test hinges upon the disputed geographic scope of the community from which the state must draw the venire under the sixth and fourteenth amendments. If the Constitution permits this court to define community as a lesser area than Cook County, the court must examine the issue of fairness and reasonableness with that smaller community in mind. From our analysis of the history of the sixth amendment and court precedent, we find that the district court did not err in evaluating the fairness and reasonableness of Davis's venire in relation to the racial makeup of Cook County.

#### 1. Legislative History

■ The district court found that the early Congress intended the venire to be drawn from an area larger than what we generally consider to be a community.[3]

---

3. The district court used the following definition of community: "a body of people having common organization living in the same place,

under the same laws, in which they share commonly the responsibilities of the organization and maintenance of a government—capable un-

According to the district court, Congress rejected James Madison's attempt to incorporate the term "vicinage" in the sixth amendment and instead adopted the term "district" to define the area from which the jury was to be drawn. The district court stated, "The Sixth Amendment was never intended to provide a defendant with a trial in his backyard, nor with a jury comprised of the families or neighbors of his victim."

The right to a jury trial in the state or district arose from the concept of vicinage but that concept came to mean different things depending on the time, place, and people affected. The term "vicinage," in early times, literally meant "neighborhood" or "county." *See Williams v. Florida,* 399 U.S. 78, 93 n. 35, 90 S.Ct. 1893, 1902 n. 35, 26 L.Ed.2d 446 (1970); Connor, *The Constitutional Right to a Trial by a Jury of the Vicinage,* 57 U.Pa.L.Rev. 197, 198–99 (1909). In England, the phrase "a jury drawn from the vicinage" meant that jurors were drawn from the immediate locality. Jurors, at that time, were expected to use their independent knowledge of the facts to decide the case. The American colonists, on the other hand, argued that the concept of vicinage prohibited England from shipping colonists accused of treason across the ocean for trial. Blume, *The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue,* 43 Mich.L. Rev. 59, 64 (1944). Vicinage, for the colonists, did not invoke the right to a jury in the immediate locality but the right to trial on the continent of North America. *See* Blume, *supra* at 65–66; Connor, *supra* at 198–99. History suggests that vicinage was an elastic concept describing a large or small area, depending on the underlying policy evoked.

The ambiguous concept of vicinage apparently also troubled the early Congress. When Congress wrote the Bill of Rights, the members debated whether to include the term "vicinage" in the sixth amendment. *See Williams,* 399 U.S. at 94, 94 n. 37, 95, 90 S.Ct. at 1902, 1903 n. 37, 1903. According to James Madison, some worried that the term was too vague if defined by law, while others argued that the concept was too narrow if interpreted as "trial in the county." *See id.* at 95–96, 90 S.Ct. at 1903–04. Ultimately, they compromised. *See id.* at 96, 90 S.Ct. at 1903. Congress adopted the sixth amendment with the added phrase "the right to a speedy and public trial, by an impartial jury of *the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law....*" U.S. Const., amend. VI (emphasis added).

Although the district court found that the jury must be drawn from an area larger than a community to satisfy the term "district or state," we are not as certain that the early congressional debates and history of the term "vicinage" lead necessarily to this inference.[4] We believe that the "district and state" language of the sixth amendment places some parameters on a legislature's power to draw the jurors but does not per se prevent a legislature from delineating a smaller area from which to draw a jury. As history suggests, vicinage is an elastic concept affected by underlying policies and, as such, should be in the majority of cases left to a legislative body. As James Madison said, "[Vicinage] must be therefore left to the discretion of the legislature to modify it according to circumstances." *See Williams,* 399 U.S. at 94 n. 35, 90 S.Ct. at 1902 n. 35 (citing 2 M. Farrand, Records of the Federal Conven-

der superior law of incorporating for the purposes of taxation and management." *Davis v. Warden,* No. 85 C 4120, slip op. at 2, n. 1 [1988 WL 17620].

**4.** James Madison's comments about the defeat of the vicinage amendment offer some support for the district court's position: "In some States, jurors are drawn from the whole body of the community indiscriminately; in others, from larger districts comprehending a number of counties, and in a few only from a single coun-

ty." Warren, *New Light on the History of the Federal Judiciary Act,* 37 Harv.L.Rev. 49, 106 (1923) (quoting Works of James Madison, Madison to Edmund Pendleton, Sept. 14, 1789). The passage suggests that the area from which the early courts drew jurors was never smaller than a county. Other courts have not relied exclusively on this passage for an expansive interpretation of the fair-cross-section criterion and we are inclined to do the same.

tion 332 (1911)); *see also* Blume, *supra* at 93 ("The jury guaranteed to the people of the various territories was not a jury of the 'county' but a jury to be selected from such places as the legislative authority might provide.")

### 2. Respondent's Approach to the Community Issue

Respondent takes a different tack. He argues that petitioner has no constitutional right to a jury drawn from the entire area of Cook County. Seventh Circuit precedent, he asserts, permits a jury selection system that excludes prospective jurors not living within a reasonable distance from the courthouse. *See United States v. Clancy*, 276 F.2d 617, 631–32 (7th Cir. 1960), *rev'd on other grounds*, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961). Furthermore, he states that this court need not constitutionally define Cook County as the community simply because an Illinois statute summons jurors on a county-wide basis.

At first glance, respondent's position appears to correspond with cases applying the sixth amendment to the federal jury selection system. According to the Supreme Court, the sixth amendment entitles a defendant to a jury drawn from the federal district in which the crime was committed, although the jury may be drawn from a division of the district rather than the entire district. *Compare Ruthenberg v. United States*, 245 U.S. 480, 482, 38 S.Ct. 168, 169, 62 L.Ed. 414 (1918) *and Salinger v. Loisel*, 265 U.S. 224, 232, 235, 44 S.Ct. 519, 522, 523, 68 L.Ed. 989 (1924) *with Barrett v. United States*, 169 U.S. 218, 228–30, 18 S.Ct. 327, 331–32, 42 L.Ed. 723 (1897). Lower courts have held therefore that a jury selection system satisfies the sixth amendment if the jury is selected from either the entire district or a division of that district. *See United States v. Young*, 618 F.2d 1281, 1287–88 (8th Cir.), *cert. denied*, 449 U.S. 844, 101 S.Ct. 126, 66 L.Ed.2d 52 (1980); *United States v. Florence*, 456 F.2d 46, 49 (4th Cir.1972); *Katz v. United States*, 321 F.2d 7, 9 (1st Cir.), *cert. denied*, 375 U.S. 903, 84 S.Ct. 193, 11 L.Ed.2d 144 (1963). Two circuits have even gone so far as to hold that, when a district is divided into divisions, a defendant may be tried in a division different than the division where the crime was committed. *See United States v. Mase*, 556 F.2d 671, 675 (2d Cir.1977), *cert. denied*, 435 U.S. 916, 98 S.Ct. 1472, 55 L.Ed.2d 508 (1978); *United States v. James*, 528 F.2d 999, 1021 (5th Cir.1976), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 383, 50 L.Ed.2d 326 (1976).[5]

The majority of jury selection systems in this litany of cases, however, complied with laws or court-imposed rules designating the area from which to draw the jury list.[6] A

---

**5.** For a discussion of the appropriate scope of grand jury selection, *see United States v. Cates*, 485 F.2d 26, 30 (1st Cir.1974) (grand jury need not be drawn from the division in which the crime was committed); *United States v. Grayson*, 416 F.2d 1073, 1076 (5th Cir.1969), *cert. denied*, 396 U.S. 1059, 90 S.Ct. 754, 24 L.Ed.2d 753 (1970) (defendant may be indicted by grand jury drawn from division other than division in which crime was committed); *Marvel v. Zerbst*, 83 F.2d 974, 977 (10th Cir.), *cert. denied*, 299 U.S. 518, 57 S.Ct. 311, 81 L.Ed. 382 (1936) (grand jury may be drawn exclusively from eastern division even though crime was committed in western); *United States v. Brown*, 281 F.Supp. 31, 36–37 (E.D.La.1968) (selection of grand jurors was properly limited to the seven parishes nearest to the court because jury selection system was random).

**6.** The Supreme Court in *Ruthenberg* rejected the sixth amendment challenge to a venire drawn from a division of the district, citing "the plain text of the Sixth Amendment, the contemporary construction placed upon it by the Judiciary Act of 1789 expressly authorizing the drawing of a jury from a part of the district, and the continuous legislative and judicial practice from the beginning." *See* 245 U.S. at 482, 38 S.Ct. at 169. In *United States v. Florence* the Fourth Circuit stated, "Since the [Jury Selection and Service Act of 1968] requires only that selection be made of jurors from the counties, parishes, or similar political subdivisions surrounding the place where the court is held—the precise designation *to be determined by the court*—it gives no right to a jury from the entire district *where there is a plan* encompassing divisions." *See* 456 F.2d at 49 (emphasis added). Likewise, the Eighth, Fifth, and Second Circuits dismissed defendants' challenges to juries drawn from divisions of the district because Rule 18 of the Federal Rules of Criminal Procedure was amended to delete the previous requirement that a defendant be tried in the division in which the crime occurred. *See Young*, 618 F.2d at 1288; *Mase*, 556 F.2d at 675; *James*, 528 F.2d

lawmaking body or court ascertained the area comparable to the "community" (the area from which the jury list must be drawn). In the case before this court, the area designated by the legislature and court does not coincide with the area that respondent would have us designate as the community.[7]

To a large extent defining the community for purposes of the sixth amendment is an arbitrary decision. *See Taylor,* 419 U.S. at 537, 95 S.Ct. at 701 ("[C]ommunities differ at different times and places. What is a fair cross section at one time or place is not necessarily a fair cross section at another time or a different place.") County lines or federal district lines do not magically determine the parameters of a community. We believe, however, that because the decision is somewhat arbitrary, it is a decision that should be left when possible to a body authorized to legislate on such matters. A well-intentioned jury supervisor, or this court for that matter, should not redefine the area from which the legislature has ordered the jury list to be drawn without a lawful justification. It is precisely because an Illinois law has stipulated the areas from which juries are to be drawn that defendant is entitled to a venire fairly and reasonably representative of that area.[8]

at 1021. The only case in which the court did not arguably rely on court or legislatively created laws was *Katz.* Deciding that a jury selection system excluding prospective jurors west of Worchester County, Massachusetts was constitutional, the court cited the federal law and took "judicial notice that this [system] has been so for many years." *See* 321 F.2d at 9.

7. The Illinois statute applicable to Cook County reads:

In single county circuits containing or which may hereafter contain more than one million inhabitants, jurors may be drawn from such parts of the county as determined by court

1. Part I the entire County
2. Part II Zip Code areas:

| 60004 | 60005 | 60007 | 60008 |
| 60022 | 60025 | 60029 | 60043 |
| 60068 | 60070 | 60076 | 60077 |
| 60104 | 60106 | 60120 | 60130 |
| 60162 | 60163 | 60164 | 60165 |
| 60195 | 60201 | 60202 | 60203 |
| 60304 | 60305 | 60601 | 60605 |
| 60612 | 60613 | 60614 | 60618 |
| 60630 | 60631 | 60634 | 60635 |
| 60645 | 60646 | 60647 | 60648 |

3. Part III Zip Code areas:

| 60402 | 60406 | 60409 | 60411 |
| 60426 | 60429 | 60430 | 60438 |
| 60453 | 60454 | 60455 | 60456 |
| 60462 | 60463 | 60464 | 60465 |
| 60475 | 60476 | 60477 | 60480 |
| 60525 | 60534 | 60546 | 60558 |
| 60617 | 60619 | 60620 | 60621 |
| 60632 | 60633 | 60636 | 60637 |
| 60650 | 60652 | 60653 | 60655 |

rule to be most favorable to an impartial trial and not to incur unnecessary expense or unduly burden the citizens of any part of the county with jury service. Such rule may utilize established divisions within the county. 78 Ill.Ann.Stat. ¶ 32.2 (Smith–Hurd).

The circuit court of Cook County made the following rule with regard to jury selection:

(c) The following Parts of the County of Cook for the purpose of drawing electors for jury service are determined to be most favorable to an impartial trial while not incurring unnecessary expense nor unduly burdening the citizens of Cook County with jury service:

| 60010 | 60015 | 60016 | 60018 |
| 60053 | 60056 | 60062 | 60067 |
| 60090 | 60091 | 60093 | 60103 |
| 60131 | 60153 | 60160 | 60161 |
| 60171 | 60172 | 60176 | 60194 |
| 60204 | 60301 | 60302 | 60303 |
| 60606 | 60607 | 60610 | 60611 |
| 60622 | 60624 | 60625 | 60626 |
| 60639 | 60640 | 60641 | 60644 |
| 60651 | 60656 | 60659 | 60660. |

| 60415 | 60419 | 60422 | 60425 |
| 60439 | 60443 | 60445 | 60452 |
| 60457 | 60458 | 60459 | 60461 |
| 60466 | 60469 | 60471 | 60473 |
| 60482 | 60501 | 60513 | 60521 |
| 60608 | 60609 | 60615 | 60616 |
| 60623 | 60627 | 60628 | 60629 |
| 60638 | 60642 | 60643 | 60649 |
| 60658. | | | |

(d) Electors shall be summoned to jury service to a facility within that Part of the County from which their names were drawn. The Chief Judge shall by order fix places for appearance in response to summons for jury duty and for the assembly of jurors consistent with (c) above.

(e) *Excuse.* The Chief Judge or his designate shall have charge of excusing jurors from jury service, impaneling them, regulating their assignment to the various judges, and supervising the recording of their services.
Circuit Court Rules of Cook County 0.4(c).

8. The Illinois circuit court rules permit the county to draw jurors from three areas—the county in its entirety, the northern half of Cook County based on jurors' zip codes, or the south-

Few cases discuss the scope of the community for purposes of sixth amendment analysis but the few decisions that expressly address the issue permit the legislature to define the community as an area larger than a suburb or neighborhood. *See Bradley v. Judges of Superior Court for Los Angeles County*, 531 F.2d 413, 417 (9th Cir.1976); *Alvarado v. State*, 486 P.2d 891, 901 (Alaska 1971); *cf. Jeffers v. United States*, 451 F.Supp. 1338, 1346 (N.D.Ind. 1978) ("community" as used in Jury Selection and Service Act refers to entire division or district, not merely a city).

■ While some courts permit the jury to be drawn from a more limited area than the county or division, no court has faced a situation in which prospective jurors, once gathered through a process of random selection, divided themselves into smaller units according to convenience.[9] Court employees or prospective jurors can not redefine community, once it has been implicitly defined by the legislature or state court, without violating the principle behind the fair-cross-section criterion. The language of the sixth amendment itself supports this conclusion. The sixth amendment states "a defendant ... is entitled to a trial ... by an impartial jury of the state and district ..., *which district shall have been previously ascertained by law*." This language suggests that a legislature or court should determine the geographic scope of the community prior to a court challenge to the jury selection system. *See, e.g., Bradley v. Judges of Superior Court*, 372 F.Supp. 26, 31 (C.D.Cal.1974), *aff'd in part and dismissed in part*, 531 F.2d 413 (9th Cir.1976) (county-wide jury selection system valid because California statutes provide for trials by county).

This principle is evident from the courts' prior approach to the fair-cross-section criterion. The Supreme Court, this court, and other federal courts have treated the community in jury selection challenges as coextensive with the geographic area from which the court or legislature ordered the venire drawn. *See, e.g., Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed. 2d 579 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1974); *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972); *Carter v. Jury Commission*, 396 U.S. 320, 322, 90 S.Ct. 518, 519, 24 L.Ed.2d 549 (1969); *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Smith v. Texas*, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); *Ruthenberg v. United States*, 245 U.S. at 482, 38 S.Ct. at 169; *Gibson v. Zant*, 705 F.2d 1543 (11th Cir.1983); *United States v. Brady*, 579 F.2d 1121, 1133 (9th Cir.), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1978); *Bradley*, 531 F.2d at 415; *United States v. Buchan-*

---

ern half, again determined by zip code. *See* Circuit Court Rules of Cook County 0.4. We do not intend, by our decision here today, to call into question the second and third options which divide Cook County approximately in half. The circuit court's division of Cook County fully conforms with our holding here which merely requires that state employees and prospective jurors maintain the community as designated by the court- and legislatively-chosen jury selection rules once those rules have been established.

**9.** A case similar to ours but nevertheless suggesting that the court gave tacit approval to a clerk who drew the pool of jurors from an area smaller than the district came before the famous Judge Learned Hand in *United States v. Gottfried*, 165 F.2d 360, 364–365 (2d Cir.), *cert. denied*, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948). In *Gottfried* the clerk's office drew jurors from three of the counties within the federal district. The defendant argued that this draw

was never sanctioned by court rule and excluded rural jurors. Judge Hand reasoned that the practice had been in place for over ten years and the courts had in the past treated the practice as though imposed by a court order. Because the courts had tacitly condoned this division of the district, Judge Hand ruled that the area from which the clerk drew the jury was a lawful division. We do not find Judge Hand's decision dispositive in our case because the jury supervisor and prospective jurors here did not act under the tacit approval of the Illinois court or legislature. *See also United States v. Evans*, 526 F.2d 701, 706 (5th Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976) (Chief Judge's clerks did not violate Jury Selection and Service Act by failing to exempt qualified jurors). *But see United States v. Kennedy*, 548 F.2d 608, 609–10 (5th Cir.1977), *cert. denied*, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977) (permitting jurors to volunteer for second term of jury service violates Jury Selection and Service Act).

*an,* 529 F.2d 1148, 1151 (7th Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976); *United States v. Titus,* 210 F.2d 210, 212–13 (2d Cir.1954); *Yoho v. United States,* 202 F.2d 241, 242 (9th Cir. 1953); *Jeffers v. United States,* 451 F.Supp. 1338, 1346 (N.D.Ind.1978); *United States v. Brown,* 281 F.Supp. 31, 33 (E.D. La.1968); *People v. Flores,* 62 Cal.App.3d Supp. 19, 24–26, 133 Cal.Rptr. 759 (1976); *Adams v. Superior Court,* 27 Cal.App.3d 719, 723, 728, 104 Cal.Rptr. 144 (1972).[10]

We do not believe that the "convenience questions" asked by the jury supervisor were part of a court- or legislatively-sanctioned system. Nothing in the record suggests that the Illinois legislature or courts authorized the jury supervisor to delineate the community through the "convenience questions." The Illinois statute and Cook County circuit rules describing the jury selection procedure do not grant authority to the jury supervisor to further narrow the geographic scope from which the jury list is drawn.[11] The statute and circuit court rules specifically designate the court and jury commissioners as the parties responsible for the jury selection process. *See People ex rel. Lasecki v. Traeger,* 374 Ill. 355, 359–60, 29 N.E.2d 519 (1940) (upholding delegation of jury selection authority to commissioners and judges); *People v. Johnson,* 154 Ill.App.3d 301, 107 Ill.Dec. 515, 507 N.E.2d 179 (1987) (delegation of jury selection authority to county judges and jury commissioners is constitutionally valid); *People v. Reed,* 108 Ill.App.3d 984, 64 Ill.Dec. 469, 439 N.E.2d 1277 (1982) (court strictly construes power of county employee to process computer program for juror selection outside presence of jury commissioners). In fact, the circuit court rules give explicit instructions as to the

areas from which the venires are to be drawn, and the Illinois courts have voiced approval for the county-wide jury selection option. *See People v. Fort,* 133 Ill.App.2d 473, 273 N.E.2d 439, 446 (1971) ("the County of Cook is a reasonable geographic area from which to draw jurors"); *People v. Free,* 112 Ill.2d 154, 97 Ill.Dec. 396, 492 N.E.2d 1269, *cert. denied,* 479 U.S. 871, 107 S.Ct. 246, 93 L.Ed.2d 170 (1986) (court implicitly defines Du Page county as community for sixth amendment analysis).

Respondent cites *Zicarelli v. Gray,* 543 F.2d 466 (3d Cir.1976), to support the proposition that Cook County is not the proper community for sixth amendment analysis. In *Zicarelli,* an assignment judge, appointed by the Chief Justice of the New Jersey Supreme Court and in accordance with New Jersey statute, designated the venue of a trial of a defendant indicted by grand jury. *See id.* at 468. By changing venue, the assignment judge moved the defendant's trial from the county in which his crimes occurred to a second county and to a jury drawn exclusively from the second county. The *Zicarelli* court found that "the Sixth Amendment prohibits courts only from obtaining petit jurors from beyond the boundaries of two large units, the state and the federal judicial district." *Id.* at 481.

We do not believe that our holding here and the position of the Third Circuit in *Zicarelli* are inconsistent. In *Zicarelli* a judge, acting under the authority and review of the court, balanced concern for the safety of witnesses and concern for court efficiency with the right to trial in the county where the crime was committed. In his claim before this court, Davis does not question the court's power to intervene in

---

**10.** The Eleventh Circuit, with regard to the community standards instructions in an obscenity case, found the community should embrace that area from which the jury is drawn and selected. *See United States v. Bagnell,* 679 F.2d 826, 835–36 (11th Cir.1982), *cert. denied,* 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983).

**11.** The Circuit Court Rules of Cook County state:

(b) *Petit jurors.* The Chief Judge or his designate shall certify to the clerk of the court the

number of petit jurors required each month. Persons summoned for service as petit jurors shall be called for the Monday of each week and shall serve for a period of two weeks. Any judge or associate judge may extend the term of any petit jury or jurors from time to time as justice may require.

Circuit Court Rules of Cook County 0.4(b). *See also* Ill.Rev.Stat., ch. 78, ¶ 32.2, § 9.2 (effective 1981).

the jury system if overriding concerns exist but challenges a jury supervisor's authority to redefine the community for purposes of sixth amendment analysis without the authority of the court or legislature. Unlike the decisions of the judge in *Zicarelli,* the jury supervisor was not acting with the court's authority. Furthermore, the Third Circuit's decision in *Zicarelli v. Gray* preceded the Supreme Court's decision in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). We do not find *Zicarelli* dispositive on the issue of community.

Similarly, we find unpersuasive respondent's reliance on this court's decision in *United States v. Clancy,* 276 F.2d 617 (7th Cir.1960), *rev'd on other grounds,* 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961). Respondent cites *Clancy* for the proposition that this court "has found nothing wrong with a method of selecting juries that excluded prospective jurors not living within a reasonable distance from the courthouse." In *Clancy,* a defendant challenged a jury selection process in which the jury commissioner and his clerk sorted the names of potential jurors according to the distance they lived from the place at which the grand and petit juries were to sit. The commissioner's actions were governed by 28 U.S.C. § 1864 (1948) (amended 1968) which at that time ordered, "the names of grand and petit jurors shall be publicly drawn from a box containing the names of not less than three hundred qualified persons." 28 U.S.C. § 1864 (1948) (amended 1968).

We find this case distinguishable for a number of reasons. In *Clancy* this court decided that defendant failed to file a motion to dismiss the grand jury indictment and a challenge to the array within the proper period of time. *See id.* at 631–32; *see also Scales v. United States,* 260 F.2d 21, 45–46 (4th Cir.1958) *aff'd,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). The subsequent discussion of the jury selection process used is dicta. Furthermore, the

jury commissioner in *Clancy* acted pursuant to a statute that outlined jury selection in very little detail; here the Illinois statute was explicit as to the area from which to obtain the jury list. *Compare* Ill.Rev.Stat., ch. 78, ¶ 32.2, § 9.2 (effective 1981) *and* Circuit Rules of Cook County 0.4(c) *with* 28 U.S.C. § 1864 (1948) (amended 1968). More importantly, the *Clancy* court did not address the sixth amendment issue but merely concluded that 28 U.S.C. § 1864 did not prohibit this method of jury selection. *See Clancy,* 276 F.2d at 632. As in *Zicarelli,* this case predated the Supreme Court's decision in *Duren v. Missouri* and therefore preceded much of the Supreme Court's development of sixth amendment analysis. We find the case of little precedential value.

■ We agree with the respondent that, when defining the community from which the jury must be drawn, the court or legislature may consider convenience to the jurors. *See People v. Johnson,* 154 Ill. App.3d 301, 107 Ill.Dec. 515, 507 N.E.2d 179 (1987) ("Dividing a county into parts and drawing jury venires from one part of the county for cases at one court facility and from another part for cases at another facility does not per se ... deny defendants an impartial trial.") The legislature or court, however, must make that decision prior to a court challenge such as this one. To redefine the scope of the community after the legislature has implicitly laid out the scope of the community undermines the fair-cross-section criterion of the sixth amendment.[12]

We do not decide today the constitutionality of a court or legislature's actions in the creation of a jury selection system. Prior decisions indicate that those bodies must create the jury selection system with an eye to the policies of fairness and inclusiveness. *See, e.g., Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *United States v. Test,* 550 F.2d 577, 594 (10th Cir.1976); *Alvarado v. State,* 486

---

**12.** The Supreme Court faced a similar problem in *Carter v. Jury Commission,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1969). In *Carter* the Court found that the jury clerk and commission-

er abused the discretion that the Alabama jury selection statute conferred on them in preparing the jury roll but held that the statute itself was not unlawful on its face.

P.2d 891 (Alaska 1971). Likewise those bodies are entitled to take into consideration the convenience of jurors when delineating the jury pool. *See United States v. Brown*, 281 F.Supp. at 33. We need not decide the constitutionality of the jury system as it was created in Cook County for that is not in dispute here. The defendant questions the constitutionality of the jury supervisor's application of the principles set down for him by the Cook County circuit court and the Illinois legislature. *Cf. United States v. Gometz*, 730 F.2d 475, 480 (7th Cir.1984), *cert. denied*, 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984) (defendant challenges clerk's application of the federal jury selection act).

### 3. Sixth and Fourteenth Amendment Policy

█ The history of jury selection challenges suggests that it is often in the application of jury selection laws that the gravest violations to the right to a fair and impartial jury occur. *See, e.g., Castaneda v. Partida*, 430 U.S. 482, 497, 97 S.Ct. 1272, 1281–82, 51 L.Ed.2d 498 (1976); *Turner v. Fouche*, 396 U.S. 346, 360, 90 S.Ct. 532, 540, 24 L.Ed.2d 567 (1970); *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); *United States v. Gometz*, 730 F.2d 475, 479 (7th Cir.1984). Processes which permit human subjectivity to influence an objective, random system often foster biased results. Regardless of the good intentions of the persons in charge of jury selection, their interplay with the system necessarily skews the system established by a court or legislative body. Those intentions have not always been as honorable as the jury supervisor's were in this case. To permit Cook County jurors to define the community in which they serve based on convenience undermines the objectivity of the jury selection system.

Likewise a narrow definition of community could undermine the policy of inclusiveness underlying the sixth amendment. *Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940); *Glasser v. United States*, 315 U.S. 60, 85, 62 S.Ct. 457, 471, 86 L.Ed. 680 (1942). The Supreme Court established the fair-cross-section-of-the-community criterion, not to exclude minorities, but to increase their participation in the system. The Supreme Court states:

> [T]he purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge.... This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system.

*Taylor v. Louisiana*, 419 U.S. at 530, 95 S.Ct. at 698 (citations omitted); *Teague v. Lane*, 820 F.2d 832, 838 (7th Cir.1987). When prospective jurors choose to serve near their homes they do not consider the broader policy of inclusiveness critical to the sixth amendment. A legislature or court, however, analyzing the jury selection system with objective debate and reflection, may establish a community that includes a cross section of diverse groups of people living within a reasonable distance from one another.[13]

### 4. Application to the Record

█ In reviewing a grant of summary judgment, we apply the same standard as

---

**13.** This court in an obscenity case suggested that the district court on remand consider the community standards of an area larger than the City of Chicago because diversity was significant to a definition of community. *See United States v. Various Articles of Merchandise, Seizure No. 170*, 750 F.2d 596, 600 n. 4 (7th Cir.1984). On re-

mand the district court used the Chicago metropolitan area as the community due to the ease of transportation and interaction between the City of Chicago and residents of the surrounding suburbs. *See United States v. Various Articles of Merchandise, Seizure No. 187*, 625 F.Supp. 861 (N.D.Ill.1986).

the district court. *Richardson v. Penfold*, 839 F.2d 392, 394 (7th Cir.1988). We must draw all reasonable inferences regarding undisputed facts in the light most favorable to the nonmovant. *Conner v. Reinhard*, 847 F.2d 384, 396 (7th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988). "Summary judgment is proper only when the moving party has established that there is no genuine issue of material fact and he is entitled to judgment as a matter of law." *Roman v. United States Postal Service*, 821 F.2d 382, 385 (7th Cir.1987).

Defendant submitted 1980 census figures indicating that blacks constituted 25.6% of the population of Cook County. The record indicates that none of the forty persons eligible for defendant's jury were black. This court must consider whether a venire containing no black members was fair and reasonable in relation to a community where over one quarter of the population is black.

The validity of defendant's claim rests on the validity of his statistics. The census figures arguably are overinclusive because they include children and other persons ineligible for jury service. The majority of jury discrimination cases that we found compare the adult voting population with the jury lists drawn. *See, e.g., Duren v. Missouri*, 439 U.S. at 361–62, 99 S.Ct. at 667; *Whitus v. Georgia*, 385 U.S. 545, 552, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1967); *Porter v. Freeman*, 577 F.2d 329, 330 (5th Cir.1978); *Savage v. United States*, 547 F.2d 212, 215 n. 5 (3d Cir.1976), *cert. denied*, 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed. 2d 810 (1977); *Murrah v. Arkansas*, 532 F.2d 105, 107 (8th Cir.1976); *United States v. Test*, 550 F.2d 577 (10th Cir.1976); *United States v. DiTommaso*, 405 F.2d 385, 388 (4th Cir.1968), *cert. denied*, 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969); *United States v. Armsbury*, 408 F.Supp. 1130 (D.Or.1976). The overinclusiveness of defendant's statistic calls into question the weight a court should give to this evidence of unfair and unreasonable representation on the venire.

This is not to say, however, that defendant has failed to prove that blacks were underrepresented on the venire. The Supreme Court, using raw census statistics that included the underaged and unqualified, held that a 23% disparity in the general population and the number of blacks on a grand jury showed unconstitutional discrimination against blacks. *See Turner v. Fouche*, 396 U.S. 346, 349, 90 S.Ct. 532, 534, 24 L.Ed.2d 567 (1970); *see also Davis v. Zant*, 721 F.2d 1478, 1481 nn. 2, 3 & 4 (11th Cir.), *cert. denied*, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706, 707 (1983); *Gibson v. Zant*, 705 F.2d 1543, 1545 nn. 2 & 3 (11th Cir.1983); *People v. Jones*, 9 Cal.3d 546, 510 P.2d 705, 707, 108 Cal.Rptr. 345, 347 (1973). We recognize also that defendant's claim would be foreclosed if we mandated that he provide statistical evidence based solely on voter registration lists because those lists no longer indicate racial distinctions. The Supreme Court in *Turner* and other courts have recognized that defendant should not be expected to carry a prohibitive burden in proving underrepresentation. *See* 532 F.2d at 108; *United States v. Butera*, 420 F.2d 564, 569 n. 13 (1st Cir.1970). Raw census figures showing a disparity as large as 25% may establish that blacks were underrepresented on the jury list.

### D. Systematic Exclusion

■ To satisfy the third prong of the *Duren* test, Davis must establish that the underrepresentation of blacks in the venire is due to systematic exclusion of blacks in the jury selection process. We find that defendant's proof of the third and final prong of the *Duren* test is not reliable and, therefore, reverse the district court's grant of the petition for writ of habeas corpus. We further find that defendant's proof is so inadequate that he has failed to survive respondent's motion for summary judgment.

In essence, Davis must prove that the jury selection system operating in Cook County caused the disparity between the percentage of blacks on the jury lists in a suburban courthouse and the percentage of blacks in Cook County. Davis submitted the deposition of Mr. Covelli, the jury su-

pervisor, who stated that he normally asked jurors whether they found the suburban courthouses convenient. Davis also supplied the affidavit of a statistician that suggested that the chances of drawing an all-white venire, such as this one, through random selection were almost infinitesimal. Finally Davis provided census figures on the racial composition of the suburbs and surrounding neighborhoods that would explain where the jurors came from if not chosen randomly.

The respondent contests that this evidence establishes the third prong of the *Duren* test. In particular, respondent argues that defendant should have derived his statistical evidence from the voting population. The respondent also noted that the jury supervisor testified he could not remember if he asked the prospective jurors in Davis's case whether Des Plaines was convenient. Furthermore, there is no direct evidence, assuming the "convenience questions" were asked here, that any members of Davis's venire were volunteers. Defendant did not submit any evidence as to the residency of the jurors on the jury list.

We find that Davis's statistical evidence is insufficient to establish that the Cook County jury selection system systematically excluded blacks in his case. As we noted above, the proper pool for consideration here is not the entire population of Cook County but the population eligible for jury duty. This would exclude children and those unqualified to participate in the selection process in Illinois. If blacks are underrepresented on the jury list because of legitimate juror qualifications, such as age, then the Cook County jury selection system does not unconstitutionally exclude blacks. Defendant's statistical evidence that this venire could not have been selected but for a nonrandom system fails to take into account that some exclusion of a percentage of the general population is constitutional if based on the population's qualifications for jury service. Because Davis's statistical evidence is based on general census figures, it does not tell us how much of the disparity comes from constitutional juror qualifications. The statistical evidence is, therefore, overinclusive.

Furthermore Davis does not consider our prior decision that voter lists are not an improper source from which to draw a pool of jurors. *See United States v. Koliboski*, 732 F.2d 1328, 1331 (7th Cir. 1984). Although *Koliboski* addressed compliance with the federal jury selection act, the federal courts that have addressed the constitutionality of voter registration lists are unanimous that a state may constitutionally draw its jurors using voter lists. *See, e.g., Murrah*, 532 F.2d at 106; *United States v. James*, 528 F.2d 999, 1022 (5th Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 383, 50 L.Ed.2d 326 (1976); *United States v. Lewis*, 472 F.2d 252 (3d Cir.1973); *Savage v. United States*, 547 F.2d 212, 215 n. 5 (3d Cir.1976), *cert. denied*, 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977); *United States v. Freeman*, 514 F.2d 171, 173 (8th Cir.1975); *United States v. Gaona*, 445 F.Supp. 1237, 1239–40 (W.D.Tex. 1978); *United States v. Ramos Colon*, 415 F.Supp. 459, 464 (D.P.R.1976). The Constitution permits a limited amount of disparity between the racial makeup of the community at large and the venire if caused by the use of voter registration lists. Defendant's statistical evidence does not adjust for the disparity that could be credited to this constitutionally permissible discrepancy. Davis's statistical evidence has failed to establish that the jury supervisor's "convenience questions" caused the underrepresentation of blacks on Davis's venire. Without adjusting for the permissible discrepancy caused by juror qualifications and the use of voter lists, Davis has not presented reliable statistical evidence.

We agree with the respondent that the district court erred in granting summary judgment with regard to this third prong of the *Duren* test. Unable to rely on defendant's statistic, we find that Davis has failed to establish that systematic exclusion of blacks caused the imbalance in Davis's venire. Davis has not provided any direct evidence as to how many jurors in his venire volunteered, or uncontroverted evidence that the "convenience questions" were asked in this case. We are not even certain if the prospective jurors in Davis's case actually came from the northwest side

of Chicago and the northwest suburbs. Furthermore, Davis has not offered any proof, beyond the record from one prior case, that a pattern of exclusion existed in the Des Plaines courthouse. *Cf. Timmel v. Phillips*, 799 F.2d 1083, 1087 (5th Cir.1986) ("a one time example of underrepresentation of a distinctive group wholly fails to meet the systematic exclusion element in *Duren*"). Without proof that the jury su-

pervisor's actions caused underrepresentation on the venire or proof of systematic underrepresentation in the suburban courthouses, we must deny defendant's motion for summary judgment.[14]

The inadequacies found in defendant's proof raise the tangential issue of whether defendant has now survived the respondent's motion for summary judgment.

---

14. As the dissent points out, the state judge in a pre-trial hearing refused to ask the jurors how they were selected to sit in Des Plaines. The dissent argues that this deprived Davis of the opportunity to establish a record of systematic exclusion and therefore the burden of proof should shift to the State to prove that the jury selection system did not systematically exclude blacks. The dissent suggests that the burden should now shift to the State because "[a]ppellee has supplied a plausible explanation" for the all-white jury and the state judge failed in his duty to consider Davis's claim before the trial began.

The record shows, however, that Davis's counsel gave the state judge very little support for the claim. Davis's counsel submitted a written motion to dismiss the array immediately before the jury was to be selected. In his written motion, he stated that the array was composed of people who lived in northwest suburbs and the northwest side of Chicago and noted that there were no black jurors in the array. He then asked the court to take judical notice that the array was composed of people from areas of Cook County populated predominantly by whites. *See* Petitioner's Statement of Undisputed Material Facts, App. A. The state judge asked Davis's counsel for some proof to back his claim. Davis's counsel stated:

[W]e have gone over the [juror] cards, and we submit that the radius comprised is predominantly white suburbs, [n]orthwest.

. . . . .

Chicago, Cook County is a very wide, very big area. It has diverse people throughout. Most of them live in a particular area. As I know the city and some suburbs, Judge, these jurors were not selected from any of the parts of the city or Cook County where they have predominantly black people. The Court can see a couple of them are from Des Plaines, Mt. Prospect, Winnetka, Glenview, Skokie, Palatine, Schiller Park, Wilmette, Brookfield, . . . and the rest are from Chicago.

. . . . .

I'm sure the Court knows Chicago. Chicago is split into obviously different areas. All of these jurors that I looked at the cards [for] were from the northwest section of Chicago. Petitioner's Statement of Undisputed Material Facts, App. B. At most, Davis's counsel offered conclusory statements and recited the names of some northwest suburbs as proof that blacks

had been systematically excluded. Counsel attached no written affidavits to his motion. He failed to specify how many jurors came from each area and what parts of the city of Chicago were represented. According to the limited explanation that Davis's counsel gave to the state judge, three-fourths of the members of the venire could have come from the city of Chicago itself, an area that counsel himself suggests is diverse. Counsel's statements to the court were vague and conclusory. In addition, he provided no evidence of the racial makeup of the areas from which the jurors allegedly were chosen. Davis's counsel gave the judge his own assessment of the geographical background of the members of the array without any factual analysis of the juror cards.

It is true that Davis's counsel also described an earlier trial in which jurors were asked if Des Plaines was convenient, but the judge refused to rely on comments about another trial as proof. *See* Petitioner's Statement of Undisputed Material Facts, App. B. This was not unreasonable, particularly because Davis's counsel did not tell the judge the name of the case or when it took place.

Even with the gift of hindsight, we find it difficult to determine the likelihood that Davis's venire resulted from systematic exclusion based on the evidence provided. We can not fault the state judge, when faced with even less proof and a full docket, for refusing to delay the trial in order to question each individual juror on a claim which was far from obvious.

More importantly, Davis failed to record where each member of the venire resided, even though the record shows that counsel was in possession of the juror cards containing such information. *See* Petitioner's Statement of Undisputed Material Facts, App. B. Davis could have made an offer of proof at the time the judge denied the motion to dismiss the array. Instead, the record contains no information regarding the residences of the members of the venire. Given Davis's inadequate explanation of why the jurors should be questioned separately and his own failure to create the record, we cannot say the State deprived Davis of the means to establish systematic exclusion. We disagree with the dissent. The state judge's failure to question the jurors individually does not require that we shift the burden of proof to the State when Davis had adequate opportunity to establish the record himself, even though the trial judge did not question the jurors.

"Summary judgment is appropriate where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.' " *Teamsters Local 282 Pension Trust Fund v. Angelos,* 839 F.2d 366, 369 (7th Cir.1988) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). Defendant had the burden of establishing that systematic exclusion caused the underrepresentation of blacks on the jury venires in areas of Cook County. We believe that defendant's statistical proof is not reliable and his remaining evidence, at best, weakly supports his claim. Without proof that establishes the link between the jury supervisor's general practices and the venire drawn in Davis's case or evidence of systematic underrepresentation, Davis has not established that the Cook County jury selection system systematically excluded blacks.

Given the disposition of this case, we need not address respondent's argument that the alleged error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967). Accordingly, we reverse the district court's grant of a petition for writ of habeas corpus to Davis on a motion for summary judgment, and we remand to the district court for entry of summary judgment in favor of the respondent.

REVERSED.

FLAUM, Circuit Judge, dissenting:

This case presents the difficult jurisprudential question of whether the Appellee's sixth amendment right to a jury venire composed of a representative cross-section of the community was violated under the Supreme Court's decisional commands in this troublesome area of the law. In order to prove a prima facie case of such a violation, the Appellee has to show three things: (1) that blacks are a distinctive group in the community; (2) that black representation on jury venires was not fair and reasonable in relation to their numbers in the community; and (3) that the underrepresentation resulted from systematic exclusion of blacks. *See Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). The majority concludes, through succinct, well-reasoned analysis with which I agree, that the Appellee has successfully met the first two requirements. The majority also finds, however, that the Appellee's proof of systematic exclusion is wanting so that summary judgment should be entered for the Appellant. With that I cannot agree. I believe that the Appellee has successfully made out a prima facie case that his sixth amendment right to a jury selected from a venire made up of a cross-section of the legislatively mandated community has been violated. Since the state has failed to rebut that prima facie case by showing a significant state interest justifying the underrepresentation, I respectfully dissent.

The majority advances two arguments in support of its finding that the Appellee failed to show that the underrepresentation of blacks on his venire was due to systematic exclusion. First, the majority states that the Appellee's statistics do not prove systematic exclusion because they are based on raw census data rather than voter eligibility data. This position apparently assumes that statistics can be used to show systematic exclusion and finds a deficiency only in the kind of statistics offered by the Appellee. I conclude that statistics, standing alone, can seldom, if ever, establish systematic exclusion. Permitting a person to prove systematic exclusion through the use of statistics effectively merges the second *Duren* requirement, that there was underrepresentation given the groups numbers in the community, with the third requirement. Thus, I believe it is not relevant in this case, at least for purposes of proving systematic exclusion, that the Appellant relied on census data as opposed to voter eligibility data.

Second, the majority finds that the Appellee has failed to produce any direct evidence of systematic exclusion in his particular case. For example, the majority points out that there is no evidence that the jury supervisor actually asked the "convenience questions" to the veniremembers in this case, that anyone actually volunteered to go to the Des Plaines courthouse, or that the venire was made up of people who resided near the courthouse. But all these

areas might have been explored had the state court judge acceded to the Defendant's request for an evidentiary hearing to determine the cause of the all-white venire. Given that denial by the state trial court, I believe it becomes incumbent upon the state, at least in this case where the Appellee has supplied a plausible explanation for the underrepresentation of blacks on his venire, to show that blacks were not systematically excluded from the venire. Since the state has failed to show that the exclusion was the result of some neutral factor unrelated to the jury selection system, that burden has not been met.

Nor is it likely that the state could succeed in justifying the underrepresentation if there were a remand for purposes of an evidentiary hearing. Mr. Covelli, the jury supervisor, testified that he cannot remember whether he asked the "convenience questions" to the potential veniremembers in this particular case. Also, there apparently is no information remaining on the geographic makeup of the veniremembers actually selected. Thus, on the law as mandated by the Supreme Court and the facts produced here, where the trial court refused to provide an evidentiary hearing to the Appellant to discover the reason why 40 whites made up his venire and where no neutral reason was advanced by the state to account for this venire, I am forced to

conclude that the systematic exclusion prong of *Duren* has been established.[1]

In sum, I think that the Appellee has shown a prima facie case of a violation of his sixth amendment right to a jury venire made up of a cross-section of the community. Therefore, I would affirm the judgment of the district court.

---

1. The majority also states that the Appellee has failed to show systematic exclusion since "Davis has not offered any proof, beyond the record from one prior case, that a pattern of exclusion existed in the Des Plaines courthouse." Other courts have also held that in order to prove systematic exclusion, evidence must be adduced from more than just the case at bar. *See Timmel v. Phillips,* 799 F.2d 1083, 1086–87 (5th Cir.1986) ("One incidence of a jury venire being disproportionate is not evidence of a 'systematic' exclusion."); *Euell v. Wyrick,* 714 F.2d 821, 823 (8th Cir.1983) ("[w]e could end our inquiry [as to systematic exclusion] by stating that Euell has failed to prove a general underrepresentation of women"). Still, I believe that following *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), systematic exclusion can be shown based on the evidence from a single case.

In *Batson,* the Supreme Court rejected its earlier pronouncement, made in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), that an equal protection violation based on a prosecutor's use of his peremptory challenges could only be proved by evidence that the peremptory challenges were used to strike a particular group in "case after case." According to the Court in *Batson,* the evidentiary requirement of *Swain* created an insurmountable burden for defendants. Thus, the Court rejected *Swain*'s evidentiary requirement and held instead that a defendant could make out a prima facie case of an equal protection violation "by relying solely on the facts concerning the [venire] selection *in his case.*" 106 S.Ct. at 1722 (emphasis in original).

Although *Batson* involved an equal protection claim, I believe that its reasoning would also extend to a case under the sixth amendment. In both sixth amendment and equal protection cases, the Court has been highly suspicious of instances of significant group underrepresentation "where the selection mechanism is subject to abuse." *Id.* In this case, the method of selecting veniremembers was subject to abuse and, therefore, the Defendant can successfully show "systematic exclusion" of blacks based solely on evidence from his own case.